No. 13552

IN THE SUPREME COURT OF THE STATE OF MONTANA

1976

---

CHARLES W. HUBER,

Plaintiff and Appellant,

-vs-

WILLIAM A. GROFF, VIRGINIA JELLISON,
PAUL A. JOHNSON, JAMES J. LEARY, DAN
K. MIZNER, PAUL E. POLZIN, WARREN F.
VAUGHAN, as members of and constituting
the Board of Housing of the State of
Montana,

Defendants and Respondents.

---

ORIGINAL PROCEEDING:

Counsel of Record:

For Appellant:

Patrick F. Hooks argued, Townsend, Montana

For Respondents:

Moulton, Bellingham, Longo and Mather, Billings,
Montana
Fredric D. Moulton argued, Billings, Montana
Walter S. Murfitt appeared, Special Assistant
Attorney General, Helena, Montana

---

Submitted: October 25, 1976

Decided DEC 29 1976

Filed: DEC 29 1976

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an original proceeding brought by Charles W. Huber, plaintiff, against the members of the Board of Housing of the state of Montana seeking a declaratory judgment pursuant to Chapter 89, Title 93, Revised Codes of Montana 1947. The Court accepted original jurisdiction pursuant to Rule 17(a), M.R.App.Civ. P. because the shortness of time before the next meeting of the legislature made "due consideration in the trial court and due appeal to this Court an inadequate remedy."

The plaintiff seeks to have the "Housing Act of 1975" which was passed as Chapter 461, Laws of 1975, by the Forty-fourth Legislature declared unconstitutional on several grounds:

First, plaintiff alleges the Act does not serve a public purpose as required by Art. VIII, Section 1, 1972 Montana Constitution.

Second, plaintiff alleges the bonds the Housing Board intends to sell are state debt and violate the requirements of Art. VIII, Section 8, 1972 Montana Constitution.

Third, plaintiff alleges that even if the bonds are not state debt, section 35-517, R.C.M., violates the separation of powers section of the 1972 Montana Constitution and impinges on the powers of the executive violating Art. III, Section 1 and Art. VI, Section 9.

Fourth, plaintiff alleges the entire Act, and especially section 35-517, violates Art. V, Section 11(5).

Fifth, plaintiff alleges the Act entails an unconstitutional delegation of the legislative power.

Sixth, plaintiff alleges the statutory flow of funds violates Art. VIII, Section 12, Section 13 and Section 14.

Seventh, plaintiff requests the Court resolve the statutory conflict between section 5-1037, R.C.M. 1947, and the Housing Act of 1975.

A brief look at the function of the proposed programs of the Housing Board is necessary as background. The Housing Board intends to issue what are basically revenue bonds. The legislature granted these bonds tax exempt status and this status, along with the fact that the bonds are issued by a carefully supervised governmental body, should reduce the risk factor resulting in a significantly lower interest rate. The Housing Board's plan is to take this low interest money and inject it into the state's mortgage money market to make mortgage money available to "persons and families of lower income." The Housing Board currently plans to use only two of the statute's programs, the loan to lender program and the mortgage repurchase program. Both programs operate in a similar manner. The first program loans money to lending institutions on the condition they loan that money within a specified time period to "persons or families of lower income". The second program provides for the purchase of mortgages on the condition that the money be lent to "persons or families of lower income." Both programs have financial incentives which encourage lending institutions to participate.

Before beginning discussion of plaintiff's specific allegations we note the adoption of the 1972 Montana Constitution resulted in a significant change in the constitutional framework in the revenue and finance provisions. That change was the result of the deletion of the 1889 Constitution's Art. XIII, Section 1 which prohibited the lending of credit of the state to individuals and corporations.

- 3 -

This prohibition serves as the background for many of the older cases in Montana and most cases in other states even today.

First. Plaintiff contends the Housing Act of 1975, sections 35-501 through 35-526, R.C.M.1947, does not serve a public purpose. Art. VIII, Section 1, 1972 Montana Constitution requires:

> "Tax purposes. Taxes shall be levied by general laws for public purposes."

This Court in Mills v. Stewart, 76 Mont. 429, 438, 247 P. 332, held:

> "The power to appropriate public funds and the power to levy and collect taxes are identical. (Panchot v. Leet, 50 Mont. 314, 146 Pac. 927; Gem Irrigation District v. Van Deusen, 31 Ida. 779, 176 Pac.. 887; College v. Hager, 121 Ky. 1, 87 S.W. 1125; 1 Cooley on Taxation 4th ed. sec.177.)"

The question is twofold: (1) Is the purpose of the legislation a public purpose? (2) Are the means selected reasonably likely to accomplish that public purpose?

The purpose of the Housing Act of 1975 is set out in section 35-502:

> "The legislature finds and declares that there is a shortage in Montana of decent, safe, and sanitary housing which is within the financial capabilities of lower income persons and families. In order to alleviate the high cost of housing for these persons, the legislature believes that it is essential that additional public moneys be made available, through the issuance of revenue bonds, to assist both private enterprise and governmental agencies in meeting critical housing needs."

The basic means to be used to accomplish this purpose are set out in section 35-505:

> "(1) The board may: (a) make loans to lending institutions under terms and conditions adopted by the board requiring the proceeds to be used by the lending institution for the making of mortgage loans for housing developments in the state for persons and families of lower income;
>
> "(b) invest in, purchase or make commitments to purchase, and take assignments from lending institutions,

of notes, mortgages and other securities evidencing loans for the construction, rehabilitation, purchase, leasing or refinancing of housing developments for persons and families of lower income in this state, under terms and conditions adopted by the board;

"(c) make, undertake commitments to make, and participate in the making of mortgage loans, including federally insured mortgage loans, and to make temporary loans and advances in anticipation of permanent mortgage loans to housing sponsors to finance the construction or rehabilitation of housing developments designed and planned for occupancy by persons and families of lower income in this state, under terms and conditions adopted by the board;

"(d) make, undertake commitments to make, and participate in the making of loans to persons and families of lower income for housing development, including without limitation persons and families of lower income who are eligible or potentially eligible for federally insured loans, federal mortgages or other federal housing assistance, when the board determines that mortgage loans are not otherwise available, wholly or in part, from private lenders upon reasonably equivalent terms and conditions, and under terms and conditions adopted by the board. * * *"

The Housing Board has taken necessary administrative steps to activate subsections (a) and (b), section 35-505 and these programs are ready to begin.

As this Court pointed out in Cottingham v. State Board of Examiners, 134 Mont. 1, 10, 11, 328 P.2d 907:

"The constitutionality of a legislative act is presumed, and this presumption must be overcome beyond a reasonable doubt before this court may overturn an expression of legislative will. * * *

"'As we have observed hitherto, the Constitution must receive a broad and liberal interpretation consistent with the purpose of the framers and the people in adopting it, that it may serve the needs of a growing state; "the proper interpretation of any constitutional provision requires us to remember that it is a part of the organic law---organic not only in the sense that it is fundamental, but also in the sense that it is a living thing designed to meet the needs of a progressive society, amid all the detail changes to which a progressive society is subject."'"

In Willett v. State Board of Examiners, 112 Mont. 317, 322, 115 P.2d 287, the Court said:

- 5 -

"* * * What is a 'public purpose' is a question primarily for legislative determination, with which we will not interfere unless there had been a clear abuse of power. * * *"

A great majority of other states which have considered nearly identical legislation found housing to be for a public purpose. State ex rel. Warren v. Nusbaum, 59 Wisc.2d 391, 208 N.W.2d 780; Minnesota Housing Finance Agency v. Hatfield, 297 Minn. 155, 210 N.W.2d 298; Vermont Home Mortgage Credit Agency v. Montpelier National Bank, 128 Vt. 272, 262 A.2d 445; New Jersey Mortgage Finance Agency v. McCrane, 56 N.J. 414, 267 A.2d 24; Maine State Housing Authority v. Depositors Trust Co., (Maine 1971), 278 A.2d 699; Opinion to the Governor, 112 R.I. 139, 308 A.2d 802; Johnson v. Penn. Housing Finance Agency, 453 Pa. 329, 309 A.2d 528; Massachusetts Housing Finance Agency v. New England Merchant's National Bank, 356 Mass. 202, 249 N.E.2d 599 (overruling advisory opinion Opinion of the Justices, 251 Mass. 716, 219 N.E.2d 18); Walker v. Alaska State Mortgage Association (Alaska 1966), 416 P.2d 245; Gibson v. Smith, ____Or. App.____, 531 P.2d 724; In the Matter of the Constitutionality of O.R.S. 456.720, ____Or.____, 537 P.2d 542; California Housing Finance Agency v. Elliot, ___Cal. Rptr.____, 555 P.2d 1493; State ex rel. West Virginia Housing Development Fund v. Copenhaver, 153 W.Va. 636, 171 S.E.2d 545; Rich v. Georgia, ____Ga.____, 227 S.E.2d 761; West v. Tennessee Housing Development Agency, (Tenn. 1974), 512 S.W.2d 275. The lone state that found this legislation is not for a public purpose is Michigan where in In re Advisory Opinion, 380 Mich. 554, 158 N.W. 2d 416, the Supreme Court of that state found the act was for a public purpose except as it related to a unique state constitution provision which relates to construction of internal improvements

- 6 -

and which prohibited the state from being a party to such improvements. The Michigan court ruled the state was not a party to the improvements. The housing statute was not found to violate any other provision and was for a public purpose for all other constitutional provisions.

This Court in Rutherford v. City of Great Falls, 107 Mont. 512, 86 P.2d 656, found a housing authority statute that allowed the city to begin slum clearance projects was for a public purpose. The only difference between Rutherford and the instant case is the means chosen to accomplish that end. In Minnesota Housing Finance Agency v. Hatfield, 297 Minn. 155, 210 N.W.2d 298, 307, it was pointed out:

> "An interest subsidy mechanism is perhaps the most unobtrusive method for the government to subsidize housing costs and housing so subsidized is less likely to be stigmatized with the tarnished image often associated with public housing operated by housing redevelopment authorities."

It is commendable the Montana legislature and the Housing Board chose the interest subsidy means to assist persons in attaining safe, sanitary and healthful housing because it involves very little direct government interference with the individual's choice of the type of housing he wishes to live in. Because this means is different from that chosen in Rutherford in no way alters the fact the legislation was enacted to accomplish a public purpose and is reasonably structured to accomplish this end. For this reason the legislation does not violate Art. VIII, Section 1, 1972 Montana Constitution.

Second. Plaintiff questions whether the bonds the Housing Board proposes to sell are state debt and therefore subject to the provisions of Art. VIII, Section 8, 1972 Montana Constitution which states:

"No state debt shall be created unless authorized
by a two-thirds vote of the members of each house
of the legislature or a majority of the electors
voting thereon. No state debt shall be created to
cover deficits incurred because appropriations exceeded
anticipated revenue."

The legislature passed the Housing Act of 1975 by a two-thirds vote of the members of each house, but it is clear that the means taken by the sponsors of this legislation to avoid a conflict with the provisions of Art. VIII, Section 8 was to have the Housing Board finance its projects by revenue bonds, which are not state debt. If the legislation was intended to create state debt that intent would be clearly expressed in the bill's title, or it would run contrary to Art. V, Section 11(3) which requires:

"Each bill, except general appropriation bills and bills
for the codification and general revision of the laws,
shall contain only one subject, clearly expressed in its
title. If any subject is embraced in any act and is not
expressed in the title, only so much of the act not so
expressed is void."

The title of the bill in question reads:

"AN ACT TO BE KNOWN AS THE HOUSING ACT OF 1975;
CREATING A BOARD OF HOUSING AND PROVIDING FOR ITS
POWERS AND DUTIES RELATING TO FINANCING TO ASSIST
PRIVATE ENTERPRISE AND GOVERNMENTAL AGENCIES TO MEET
HOUSING NEEDS." [Chapter 461, Laws of 1975.]

A two-thirds vote of the legislature is an alternative to a vote at a general election and this Court will not find the legislature has approved the creation of a state debt unless it is apparent that was the obvious intent of the legislature. That intent is not present in this case.

We examine the Act to see if a state debt was created.

The Housing Act of 1975 at section 35-520 reads:

"Credit of state not pledged. Obligations issued under
the provisions of this act do not constitute a debt or
liability or obligation or a pledge of the faith and credit
of the state but are payable solely from the revenues or
assets of the board. An obligation issued under this act

shall contain on the face thereof a statement to the effect that the state of Montana is not liable on the obligation and the obligation is not a debt of the state and neither the faith and credit nor the taxing power of the state is pledged to the payment of the principal of, or the interest on, the obligation."

In Fickes v. Missoula County, 155 Mont. 258, 264, 470 P.2d 287, the Court held that financing projects by the use of revenue bonds did not create a debt which would be subject to the requirements of the predecessor of Art. VIII, Section 8, 1972 Montana Constitution. After citing a series of revenue bond cases this Court, in Fickes, pointed out:

"The common quality of all these projects is that in each there is explicit provision that the public body issuing the bonds does not obligate its taxing power to pay for them. The same exact provision is written into the law and the bonds involved in this case, so that the same decision must necessarily be made in this case."

That exact language would be applicable here, except the Housing Act of 1975 contains an additional section, section 35-517, which is referred to as a "moral make-up clause" and reads:

"Maintenance of capital reserve account. (1) In order to assure the maintenance of the capital reserve account, the chairman of the board shall on or before September 1 in the year preceding the convening of the legislature, deliver to the governor a certificate stating the sum, if any, required to restore the capital reserve account to the minimum capital reserve requirement. The governor shall include in the executive budget submitted to the legislature, the sum required to restore the capital reserve account to the sum of minimum capital reserve requirements. All sums appropriated by the legislature shall be deposited in the capital reserve account.

"(2) All amounts appropriated to the board by the legislature under this section constitute advances to the board and, subject to the rights of the holders of any bonds or notes of the board, shall be repaid to the state's general fund without interest from available operating revenues of the board in excess of amounts required for the payment of bonds, notes or other obligations of the board, for maintenance of the capital reserve account and for operating expenses."

All the objections to section 35-517 assume the very worst combination of events will happen---that the mortgages invested in will not provide enough revenue to pay off the bonds; that the governor recommended and the legislature approved the loan provided for and the land that secures the mortgages has lost value, and, the sale of the land would not cover the amount secured by the mortgage. This is extremely unlikely because land values have generally gone up and mortgagors have generally paid a portion of the underlying debt before default and the land covers the full amount of the debt remaining. There is little likelihood of resort to the provisions of section 35-517 but nonetheless its provisions must meet constitutional muster.

An Oregon court of appeals case, Gibson v. Smith, ____ Or. App.____,531 P.2d 724, 728, reviews the difficulties the courts in various jurisdictions have had with this provision in its various forms:

> "We have considered the opinions and conclusions of other courts which have discussed the constitutionality of housing acts with provisions similar to those questioned at bar. All of them consider provisions like those in ORS 456.720(5) to be ineffectual for their purported purpose, but several leave them extant as expressions of what the legislatures hope future legislatures will do. Some strike such provisions because they are nullities. In all cases, the crucial questions are decided on the basis of the particular state's constitutional provisions. In no case we have found have such acts been totally struck down, and all hold they bear a public purpose. Walker v. Alaska State Mortgage Association, supra; Maine State Housing Auth. v. Depositors Trust Co., 278 A.2d 699 (Me. 1971) (which held that the attempt to bind future legislatures is ineffective, but that the attempt would be interpreted so that the word 'shall' means 'may' in order to give it the effect of expressing a 'hope' or 'aspiration' that future legislatures would appropriate from general funds in the event of revenue deficits); Massachusetts Housing Finance Agency v. N.E. Merchants National Bank, 356 Mass. 202, 249 N.E.2d 599 (1969)(where the court interpreted the questioned provision much as did the Maine court in Maine State Housing Auth. v. Depositors Trust Co., supra); Constitutionality, PA 1966, No. 346, 380 Mich. 554, 158 N.W.2d 416 (1968) (in which the court held invalid a provision like that involved at bar); Minnesota Housing

Finance Agency v. Hatfield, 297 Minn. 155, 210 N.
W.2d 298 (1973); New Jersey Mortgage Finance Agency v.
McCrane, 56 N.J. 414, 267 A.2d 24 (1970); Martin v.
Housing Corp., 277 N.C. 29, 175 S.E.2d 665 (1970);
Johnson v. Pennsylvania Housing Finance Agency, 453
Pa. 329, 309 A.2d 528 (1973); Vt. Home Mort. Cr. Agcy. v.
Mont. Nat. Bank, 128 Vt. 272, 262 A.2d 445 (1970);
State ex rel. v. Copenhaver, 153 W. Va. 636, 171 S.E.2d
545 (1969); and State ex rel. Warren v. Musbaum, 59 Wis.2d
391, 208 N.W.2d 780 (1973) (where the questioned provision
included the sentence about the governor including a
deficit in the reserve fund in a future budget, not the
sentence requiring an appropriation by a future legislature.
It did require a bill to pay the same to be introduced
in future legislatures, which the court said was a nullity.
Nevertheless, on the theory that the included provision was
a legislative attempt to invade executive authority, the
provision was held to be unconstitutional and a nullity)."

In <u>Gibson</u> the Oregon court found the equivalent section to section

35-517 in the Oregon statute to be unconstitutional as a viola-

tion of that state's constitutional provision equivalent to Art.

VIII, Section 8, 1972 Montana Constitution.  The Oregon Supreme

Court in an original proceeding, In the Matter of the Constitu-

tionality of O.R.S. 456.720, (Ore.1975), 537 P.2d 542, 545, found

that the section, after an amendment which removed the mandatory

direction to the legislature to appropriate funds and replaced

it with permissive language, was constitutional.  It pointed out:

"Intervenors regard the presence of a make-up provision
as a pledge of the state credit because a bond dealer or
vendor of certificates would point to the statute as an
assurance to potential buyers of the certificates of
indebtedness, that if the source of payment of the certi-
ficates should prove insufficient, a future legislature
would come to the rescue with an appropriation of state
funds to prevent or overcome a default.  Certainly the
purchasers of the bonds cannot predicate such an expecta-
tion upon any legal obligation of the state because the
bonds themselves are required to contain a statement to
the contrary.  If there is a pledge, then, it is at most
based upon a moral obligation which the members of future
legislatures might feel to meet the deficiency.  We do
not interpret Article XI, §7 as prohibiting such a moral
and therefore unenforceable pledge. * * *"

Montana's version of this section is permissive in its direction to the legislature and it is clear the Forty-fourth Legislature did not bind a future legislature to appropriate money.

Third    Section 35-517 presents a second difficulty due to the mandatory language in its direction that the governor include the Housing Board's appropriation request in his budget. In State ex rel. Warren v. Nusbaum, 59 Wis.2d 391, 208 N.W.2d 780, the Wisconsin Supreme Court found such a mandatory direction violated that state's constitutional provision which said the governor "shall communicate to the legislature, at every session, the condition of/state, and recommend  such matters to them for their consideration as he may deem expedient." / equivalent section in the 1972 Montana Constitution, Art. VI, Section 9, provides:

> "Budget and messages.  The governor shall at the beginning of each legislative session, and may at other times, give the legislature information and recommend measures he considers necessary.  The governor shall submit to the legislature at a time fixed by law, a budget for the ensuing fiscal period setting forth in detail for all operating funds the proposed expenditures and estimated revenue of the state."

The Constitutional Convention Notes point out that the difference between this section and the corresponding section in the 1889 Montana Constitution is that:

> "Makes it mandatory that Governor send budget to legislature.  Otherwise no change except in grammar."

This Court in State ex rel. Normile v. Cooney, 100 Mont. 391, 403, 47 P.2d 637, stated:

> "'The separation of the government into three great departments does not mean that there shall be "no common link of connection, or dependence, the one upon the other in the slightest degree"(1Story's Commentaries on the Constitution, sec. 525); it means that the powers properly belonging to one department shall not be exercised by either of the others. (Const. Art.IV, sec.1.)  There is no such thing as absolute independence.'"

- 12 -

Budgeting is one of those common links. The executive depends on the legislature for funding and because the legislature must set the state's budget in a ninety day session every other year, and because this is a period when there are numerous other matters to attend to, the legislature must also rely on the executive to provide the information it needs to budget intelligently. By statute, section 79-1015, R.C.M. 1947, the governor is required to submit the budget in a certain form with specified contents. The governor is prohibited from altering any legislative appropriation request by section 79-1013, R.C.M.1947.

It is this difference, the mandatory budget requirement, that creates the difference between Montana and Wisconsin. There was no constitutionally prohibited invasion of the executive's power when the legislature required in section 35-517 that the governor include the Housing Board's request in his budget.

Fourth Difficulty presented by section 35-517 is also whether an appropriation made pursuant to that section would violate Art. V, Section 11(5), 1972 Montana Constitution which reads:

> "No appropriation shall be made for religious, charitable, industrial, educational, or benevolent purposes to any private individual, private association, or private corporation not under control of the state."

This is one of the sections of the 1972 Constitution directed to the legislature. Art. V, Section 11(6) allows challenge on the ground of noncompliance with the section only within two years of a statute's effective date. This challenge is within that time period.

The predecessor section in the 1889 Constitution was Art. V, Sec. 35, which read:

> "No appropriation shall be made for charitable,
> industrial, educational or benevolent purposes to
> any person, corporation or community not under the
> absolute control of the state, nor to any denomina-
> tional or sectarian institution or association."

The Convention Notes indicate there was no change between the
new and the old provision except as to grammar. It must then be
assumed the 1972 Montana Constitution expresses the intent of
the framers more precisely. This is significant because there
are differences in the wording of the 1889 and 1972 sections.
The 1889 section had the word "absolute" before the word "control"
and the 1972 section adds the word "private" before person,
association, and corporation. In Veterans' Welfare Comm'n v.
V.F.W. & D.A.V., 141 Mont. 500, 510, 379 P.2d 107, this Court
in discussing the difference between a line item appropriation to
the private veterans' organizations and appropriations to the
housing authority in Rutherford and to the Montana Armory Board,
in Geboski v. Montana Armory Board, 110 Mont. 487, 103 P.2d 679,
said:

> "'However, the distinction between those cases and
> the case at bar is the distinction between a private
> corporation and a public corporation, the functions
> of the latter of the two being under the control of the
> state. In all three of the cases above referred to the
> court was careful in pointing out that the agency was a
> public corporation under the control of the state and
> in the nature of a municipal corporation.'"

The Montana Housing Board is not a private corporation, it is a
public corporation. It received all of its powers directly from
the legislature and its duties and responsibilities are set out
clearly by the statute which created it. Art. V, Section 11(5),
1972 Montana Constitution, is not applicable to appropriations
under section 35-517, R.C.M. 1947.

-14-

<u>Fifth</u>   Plaintiff alleges the Housing Act of 1975 entails an unconstitutional delegation of legislative power violating Art. V, Section 1, 1972 Montana Constitution. The Court stated in Milk Control Board v. Rehberg, 141 Mont. 149, 161, 376 P.2d 508:

> "* * * Concerning adequate standards and guides in delegation of legislative power, this court has stated the rule as follows:  If the legislature fails to prescribe with reasonable clarity the limits of power delegated to an administrative agency, or if those limits are too broad, its attempt to delegate is a nullity.
>
> "On the other hand a statute is complete and validly delegates administrative authority when nothing with respect to a determination of what is the law is left to the administrative agency, and its provisions are sufficiently clear, definite, and certain to enable the agency to know its rights and obligations."

In this case, plaintiff argues the statute is too vague as to the term "persons and families of lower income".  The legislature set out its definition of this term in section 35-503(16):

> "'Persons and families of lower income' means persons and families, with insufficient personal or family income who require assistance under this act, as determined by the board, taking into consideration:
>
> "(a) the amount of the total personal and family income available for housing needs;
>
> "(b) the size of the family;
>
> "(c) the eligibility of persons and families under federal housing assistance of any type based on lower income or a functional or physical disability;
>
> "(d)  the ability of persons and families to compete successfully in the normal housing market and to pay the amount at which private enterprise is providing decent, safe, and sanitary housing;
>
> "(e) the availability and cost of housing in particular areas; and
>
> "(f) needs of particular persons or families due to age or physical handicaps."

- 15 -

All that is left for the agency to do to place a figure on the income limit for "persons and families of lower income" is to inquire into the facts as the statute directs and make the determinations required by the statute. The agency has heeded this legislative directive and adopted a program rule which sets out these same basic considerations in greater detail. See: M.A.C. 22-3.18 (6) S1840. Pursuant to this program rule the Housing Board adopted $16,000 as the upper limit. We note here (1) this Act is aimed at a specific category of persons, those whose income is stable but because of the high price of money cannot afford to buy a home. It is obvious those with little or no income cannot afford to purchase a home no matter how low the interest rate; (2) the factual bases of the determinations made by the Board constantly change and the legislature meets only once every two years. The agency may meet as often as is necessary and may change the income level as the facts which serve as the basis for its original determination change. The delegation of this power does not violate any constitutional prohibitions. It is a clear, definite, and certain direction to the agency which enables the agency to know its rights and obligations.

Sixth Plaintiff charges the flow of funds under the Act violates Art. VIII, Sections 12, 13, 14, 1972 Montana Constitution.

The Housing Act of 1975 provides for two methods of creation and issuance of its revenue bonds, by resolution as set out in section 35-508(1), or by trust indenture as set out in section 35-513. The bonds issued under the first procedure (section 35-508(1)) would follow a complex procedure for deposit with the state treasurer in the state fund with accounts in various state fund accounts and parallel act accounts. By the alternative provision (section 35-513), the funds would be handled by much the same system but the proceeds

from the bond sale would be handled by the trustee. Section 35-513, R.C.M. 1947, provides in pertinent part:

> "* * * A trust indenture may contain provisions for protecting and enforcing the rights and remedies of the bondholders as are reasonable and proper and not in violation of law, including covenants setting for the duties of the board in relation to the exercise of its powers, the custody, safeguarding and application of all moneys. The board may provide by a trust indenture for the payment of the proceeds of the bonds and the revenues of the trustee under the trust indenture of another depository, and for the method of disbursement, with safeguards and restrictions as it de termines. * * *"

This method is consistent with section 79-306(3), R.C.M. 1947, which states:

> "Nothing in this chapter shall impair or otherwise affect any covenant entered into pursuant to law by any agency or institution respecting the segregation, deposit, and investment of any revenues or funds pledged for the payment and security of bonds or other obligations authorized to be issued by such agency, and all such funds shall be deposited and invested in accordance with such covenants notwithstanding any provision of this chapter."

The chapter referred to is entitled "Deposit and Investment of State Funds". The constitutional provisions which plaintiff argues these procedures violate require that the legislature shall by law insure strict accountability of all revenue received and money spent. The chapter provides for a unified investment program and requires that there be an appropriation made by law, and a warrant drawn by the proper officer before money be paid out of the treasury.

It is clear the legislature provided by law for strict accountability of the funds. A proper trustee for the bond revenue is required and there are provisions which authorize a legislative audit at any time of the Board's books and a yearly audit. The trust indenture requires a monthly report to the state treasurer as to all indenture funds and bonds of record and accounts must be kept and be open to inspection by the state treasurer, the trustees and holders of more than five percent of the outstanding bonds.

The Constitution's provision for the unified investment fund does not require that all agencies participate regardless of the nature of the agency. Where, as here, the agency is not using state funds and is setting up what amounts to its own specialized investment fund with a particular purpose, it is reasonable to allow, as the legislature did, the agency to take care of its own funds in a manner appropriate to its function.

The Constitution's provisions for payment out of the treasury only on a warrant and pursuant to an appropriation presents no problem, for the trust indenture funds are not deposited with the treasurer and the funds received from the sale of the resolution bonds are by statute deemed continuously appropriated. Section 35-523(c), R.C.M. 1947.

This Court discussed a similar provision in Geboski v. Montana Armory Board, 110 Mont. 487, 493, 103 P.2d 679, where it said:

> "Section 14 relates to the method of handling the deposits of (f) state monies. The money raised here by the sale of bonds becomes a special fund to be disbursed for the erection of proposed buildings. This money is not derived by taxation and consequently need not be handled in that manner."

Seventh  The last issue raised is the conflict between the Housing Act of 1975 and section 5-1037, R.C.M. 1947, which prohibits state banks from borrowing funds without prior approval of the department of business regulation. Here, recourse to the rule of statutory construction which provides that where a specific statute conflicts with a general statute the specific controls over the general to the extent of any repugnancy. State ex rel. Browman v. Wood, ____Mont.____, 543 P.2d 184, 32 St. Rep. 1136; Montana Ass'n of Tobacco and Candy Distributors v. State Board of Equalization,

156 Mont. 108, 476 P.2d 775; In re Stevenson's Estate, 87 Mont. 486, 289 P. 566. It is clear that state banks may participate in the Housing Board's programs without the prior approval of the department of business regulation because the legislature by its definition of "lending institution" clearly intended to cover state banks and thereby made the necessary determination that state banks may participate.

A declaratory judgment is entered in accordance with the foregoing opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____
Justice

_____
Hon. Peter G. Meloy, District Judge, sitting for Justice Wesley Castles.

. . . . . . . . . . .

Mr. Justice Frank I. Haswell, took no part in this Opinion.