No. 85-447

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

JOHN L. HOLLOW,

        Plaintiff

    -vs-

STATE OF MONTANA, MONTANA ECONOMIC DEVELOPMENT
BOARD, D. PATRICK McKITTRICK, YVONNE SNIDER,
JEREMIAH R. SULLIVAN, G. STEVEN BROWN, KAREN
R. LOCKE, JOHN C. ORTH, JACKSON L. SCHUTTE,
as members of said Montana Economic Development
Board, MONTANA STATE DEPARTMENT OF COMMERCE,
and KEITH COLBO, Director of said Department
of Commerce,

        Defendants

ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

    For Plaintiff:

        Hull & Sherlock; Jeffrey M. Sherlock,
        Helena, Montana, Argued

    For Defendants:

        Dorsey & Whitney; Mae Nan Ellingson,
        Great Falls, Montana, Argued

                Submitted: March 12, 1986
                  Decided: August 8, 1986

Filed: AUG 8 1986

                            Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

In this case we determine and hold that the provisions of § 17-6-308, MCA, which permit the use of in-state investment fund monies (§ 17-6-306, MCA) derived from taxation to guarantee loans or bonds of private individuals or private entities either directly or through the capital reserve account (§ 17-5-1515, MCA) or through the economic development guaranty fund (§ 17-5-1520, MCA) are unconstitutional from the viewpoint of our state constitution.

## I.

This is an original proceeding in this Court, brought by John L. Hollow, a citizen, resident of Helena, Montana, and taxpayer, voter and property owner in this state. His action is brought under the Uniform Declaratory Judgments Act (§ 27-8-101, MCA, et seq.) for the purpose of obtaining from this Court a declaration that certain provisions of S.B. 349, Ch. 640, Laws of Montana (1985), enacted by the 49th Legislative Assembly are invalid as offending the State Constitution. We ordered responses from counsel representing the defendants, which responses were served and filed. Thereafter, oral argument was had before the Court on March 12, 1986 concerning the contentions raised by the complaint and the responses.

There is no dispute between the parties as to whether this Court has jurisdiction to proceed, but in an original proceeding, we must, of course, find jurisdiction under our granted powers. To be sure about it, the same facts and factors that excited our acceptance of original jurisdiction

- 2 -

and caused us to find standing for the taxpayer in Grossman v. State Department of Natural Resources (Mont. 1984), 682 P.2d 1319, 41 St.Rep. 804, are present in this case. Here Hollow challenges the constitutionality of various aspects of the in-state investment program; the issuance of bonds by the state under the program is delayed because underwriters or investors who would purchase bonds require a final court resolution of the constitutional issues involved; the program involves major segments of the state's population, and has great impact upon its economy; requiring the case to proceed first to the District Court and then here on appeal for a final resolution will require a lapse of time almost intolerable; and the proceedings here are designed to obtain a final judgment on the validity of the bonds which might be issued thereunder, so if valid, the bonds would be marketable. As we stated in Grossman, the issues here are fairly stated, fully explored and vigorously contended so that we have a justiciable controversy suitable for final resolution. Therefore we assume jurisdiction.

II.

The Montana Economic Development Board was created by § 2-15-1805, MCA; its individual members at the time of the complaint here are the defendants McKittrick, Snider, Sullivan, Brown, Locke, Orth, and Schutte. The Board is administratively attached to the Montana Department of Commerce, an administrative agency of the state which is directed by the defendant Colbo. The Board is purporting to and intends to issue bonds within the limits prescribed by S.B. 349 (the title of the legislation in the legislature; we will refer as we proceed in this discussion to pertinent parts of S.B. 349 as the said parts are now enumerated in the

- 3 -

code sections of the Montana Codes Annotated). The Board adopted a resolution on August 8, 1985 declaring its intention to issue the total principal amount of bonds permitted under the legislation. However, the Board has been advised by its bond counsel that there are several constitutional issues raised by the legislation which have not been specifically addressed by this Court in prior decisions and that a final resolution of those issues would be required by the investors to effectuate the sale of bonds issued by the Board.

### III.

A short statement of what S.B. 349 accomplished is that the legislation authorized the Board to utilize the in-state investment fund to guarantee loans or bonds otherwise authorized to be made or issued by the Board under the provisions of the Montana Economic Development Bond Act, the Municipal Finance Consolidation Act, or the Montana Health Facility Authority Act; and to make and agree to make loans from the in-state investment fund to the capital reserve account and guarantee funds which secure certain bonds issued by the Board.

While that short statement may suffice to advise the reader of the effect of the legislation, it does not begin to lead the reader through the maze of statutory provisions attending the activities of the Board. These we must explore in some detail for background to our decision here.

The legislature adopted the "Montana Economic Development Bond Act of 1983" (§ 17-5-1501, MCA, et seq.) for the purposes of promoting the general welfare of the people of the state, to increase job opportunities, and to retain existing jobs by making available funds for industrial,

commercial, agricultural and other uses for economic development. The Board was given power to issue bonds and notes for "projects" and "major projects" (§ 17-5-1506, MCA) and to maintain necessary accounts (§ 17-5-1514, MCA). One of such accounts is the capital reserve account, of which more later.

The Board was also given power to engage in a project guarantee program (§ 17-5-1519, MCA) and to guarantee payments required by a loan, lease, or other credit arrangement for any project funded as authorized. Particularly with respect to its guarantee program, the Board was also empowered to create an economic development guarantee fund (§ 17-5-1520, MCA).

IV.

The capital reserve account established by the Board is provided in § 17-5-1515, MCA. It consists of funds appropriated and made available by the state for the purposes of the account, proceeds from the sale of notes or bonds to the extent provided in the resolutions or indentures of the Board authorizing their issuance and such other funds as may be available from other sources.

Funds held in the capital reserve account must be used solely for the payment of principal of or interest on bonds secured by the account and must be maintained in a minimum amount sufficient to meet obligations of principal, interest and redemption premiums and debt service for such bonds and notes.

No bonds issued by the Board, and funded through the capital reserve account are a debt, liability or obligation of the faith and credit of the state, but are payable solely from the revenue or assets of the Board (§ 17-5-1523, MCA).

- 5 -

Nonetheless, the governor must include in the executive budget submitted to the legislature any sums required to restore the capital reserve account to the sum of minimum capital reserve requirements (§ 17-5-1516, MCA). This latter provision is denoted the "moral obligation" clause.

V.

The Board is further empowered to establish a project guarantee program (§ 17-5-1519, MCA). The Board may make commitments to guarantee payments required by a loan, lease or other credit arrangement for any project funded under the Montana Economic Development Bond Act, or under industrial development projects as outlined in § 90-5-101, MCA, et seq. To fund this program, the Board is authorized to create an economic guarantee fund (§ 17-5-1520, MCA). It consists of insurance fees, premiums and other revenue and assets as the Board considers necessary to comply with any contract or agreement entered into by the Board and of borrowings up to $7.5 million from any available state funds.

Funds in the Economic Development Guarantee Fund must be used to satisfy any claim resulting from a defaulted loan lease or any other credit agreement. Once again the credit of the state is not pledged with respect to this fund but the governor is required to include in the executive budget submitted to the legislature sums required to restore the economic guarantee fund to the minimum reserve requirements, which is an amount not in excess of the aggregate annual payments due under the loans, leases, or other credit agreements guaranteed by the Board (§§ 17-5-1520(3), (4), MCA).

The projects for which the funds produced by Economic Development Bonds may be used are broadly defined. A "major

project" is one whose cost or appraised value exceeds $800,000 (§ 17-5-1503(6), MCA). Otherwise a "project" means, under § 17-5-1503(7), MCA, those projects outlined in § 90-5-101(6), MCA, which follow:

> "Project" means any land; any building or other improvement; and any other real or personal properties deemed necessary in connection therewith, whether or not now in existence, which shall be suitable for use for commercial, manufacturing, agricultural, or industrial enterprises; recreation or tourist facilities; local, state, and federal governmental facilities; multifamily housing, hospitals, long-term care facilities, or medical facilities; small-scale hydroelectric production facilities with a capacity of 50 megawatts or less; and any combination of these projects.

VI.

The provisions of S.B. 349 that create constitutional problems, as we view it, arise out of the use of the in-state investment fund.

The 1972 Montana Constitution, in Art. VIII, § 13, directs that the state engage in a unified investment program. Accordingly, § 17-6-201, MCA, directs that public funds be administered by the Board of Investments and the Montana Economic Development Board. The power of the Board of Economic Development, however, is limited to investment of the in-state investment fund (§ 17-6-201(4), MCA).

The Montana in-state investment fund is derived partly from the taxation of the severance of coal in Montana. The Montana in-state investment fund consists of (1) 25% of the revenue deposited after June 30, 1983 into the permanent coal tax trust fund established in § 17-6-203(5), MCA; (2) the principal payments on all investments made from the Montana in-state investment fund; and, (3) 15% of the annual income and earnings on the Montana in-state investment fund

- 7 -

appropriated to the coal severance permanent fund by §
17-5-704(2), MCA. (Section 17-6-306, MCA.)

At this point, it is necessary to set out in full the
perimeters of § 17-6-308, MCA, respecting authorized
investments of the in-state investment fund. The statute
follows:

> (1) The Montana in-state investment fund must be
> invested as authorized by rules adopted by the
> board. For purposes of this section, "investment"
> includes the guaranty of loans or bonds in
> consideration for a fee, in lieu of the actual
> acquisition of such loans or bonds.

> (2) The board may use the in-state investment fund
> to guarantee loans or bonds issued under the
> provisions of 17-5-1501 through 17-5-1529, Title
> 17, chapter 5, part 16, or Title 90, chapter 7.
> Each guaranty must be given in consideration of a
> fee. The fees must be paid to the board. The
> guaranty must provide directly or by separate
> agreement that the board is fully subrogated to the
> rights of the obligee under the loan or bond. The
> board shall by rule establish the maximum ratio
> between guaranty funds available and loans or bonds
> to be guaranteed. The board may covenant in bond
> issues to maintain such ratio. Unless bonds issued
> to finance a project are secured by a common
> capital reserve account and a common guaranty fund,
> the maximum amount of the guaranty authorized by
> this section may not exceed $3,000,000 with respect
> to the bonds or loans to finance the project.

> (3) The board may make loans from the in-state
> investment fund to the capital reserve account
> created pursuant to 17-5-1515 and the guaranty fund
> created pursuant to 17-5-1520 to establish balances
> or restore deficiencies therein. The board may
> agree in connection with the issuance of bonds or
> notes secured by such account or fund to make such
> loans. Loans must be on such terms and conditions
> as the board determines and must be repaid from
> revenues of the board realized from the exercise of
> its powers under 17-5-1501 through 17-5-1529,
> subject to the prior pledge of the revenues to the
> bonds and notes.

Under S.B. 349, the legislature in 1985 amended
subdivision (1) of § 17-6-308, MCA, to provide that an
"investment" includes the guaranty of loans or bonds in
consideration of a fee, in lieu of the actual acquisition of

such loans or bonds. Such a provision did not exist prior to the amendment to define an investment.

The concept that undertaking to guaranty the private debt or obligation of another is an "investment," is peculiar, to put it mildly. It is akin to co-signing a note at the bank for a friend, which as Shakespeare noted, "oft loses both itself and friend." The defendants contend that guaranties on loans authorized under the statutes here are nothing more than additional types of investments and that the act of investing by guaranty does not create a debt on the part of the state. They rely on an informal opinion of the Montana Attorney General to that effect, and on provisions of § 17-6-308, MCA that the guaranty must be given in consideration of a fee; that it must provide that the Board is subrogated to the rights of the obligee; that there must be a maximum ratio between guaranty funds available and loans to be guarantied; that the maximum amount of the guaranty may not exceed $3 million in any project unless the bond is secured by a common guaranty fund and that the loans must be repaid from the revenues of the Board.

An "investment" is defined in Webster's New Collegiate Dictionary (1981 ed.) as "the outlay of money usually for income or profit; a capital outlay." When an investment is by guaranty, the outlay will come when the project has failed or the income is lost. A guarantor agrees to answer for the debt, default or miscarriage of another. Section 28-11-101, MCA.

The provisions of § 17-6-308, MCA, which permits the Board to establish a maximum ratio between guaranty funds available and loans to be guarantied have prompted the Board

to adopt by resolution an administrative rule, A.R.M. §
8.97.413, which reads in pertinent part:

> (2)   The total principal amount of loans guarantied
> under A.R.M. 8.97.410 and bonds guarantied under
> 17-6-308(1), MCA, and of outstanding loans and
> obligations to make loans to the Capital Reserve
> Account and Guaranty Reserve Account shall not
> exceed, as of the date of the guaranty, loan or
> obligation, eight times the Guaranty and Loan Base.

> (3)   The Guaranty and Loan Base shall, at the time
> of determination, be an amount equal to 25% of the
> current market value of all assets of the board in
> the Investment Fund.

Thus, the potential liability of the state is for the
full amount of all guaranties made by the Board which can be
as great as two times the amount of the in-state investment
fund.   In a worst case scenario, guaranty holders may look to
the state for full satisfaction for when "the legislature
validly acts to establish a debt under Art. VIII, § 8, that
indebtedness becomes a state obligation extending over the
life of the indebtedness, and every succeeding legislative
assembly has an unavoidable duty to provide for it, in the
manner required by the authorizing law." Grossman, 682 P.2d
at 1332, 41 St.Rep. at 819-20.

The strictures which protect the credit of the state
with respect to bonds issued by the Board are not present
with respect to the use of the in-state investment funds
under § 17-6-308, MCA.   With respect to bonds, § 17-5-1523,
MCA, provides that such obligations do not constitute a debt,
liability, obligation or pledge of the faith or credit of the
state.   To the contrary, under § 17-6-308, MCA, the Board may
use the in-state investment fund to pay obligations of
guaranty of loans or bonds.   In so doing, the Board would
apply that portion of the in-state investment fund that
derives from 25% of the coal severance tax revenues provided

in § 17-6-306, MCA. When such funds are used to satisfy guaranties of private debts or obligations its use offends Art. VIII, § 1 of the Montana Constitution which provides taxes shall be levied by general laws for public purposes; Art. V, § 11(5) that no appropriation shall be made for industrial or benevolent purposes to any private individual or private corporation not under the control of the state; and Art. VIII, § 13(1), providing for a unified investment program, insofar as § 17-6-308, MCA allows guaranties of private obligations as permissible investments. See Veteran's Welfare Commission v. V.F.W. and D.A.V. (1963), 141 Mont. 501, 379 P.2d 107.

In like manner, the provisions of subdivision (3) of § 17-6-308, MCA, are constitutionally impermissible. Under that subdivision, the Board may make loans from the in-state investment funds to the capital reserve account we have described above and the economic guaranty fund also described above to establish balances or restore deficiencies therein. The loans are repayable from revenues of the Board realized from the exercise of its power and the issuance of bonds but subject to the prior pledge of the revenues to the bonds and the notes.

As we noted, under § 17-5-1523, MCA, the credit of the state is not pledged to secure the bonds issued by the Board. Section 17-6-308(3), MCA, sidesteps that provision by providing that the Board may agree in connection with the issuance of bonds to make loans out of the in-state investment fund to the capital reserve account and the economic guaranty fund. The effect is, without the further action of the legislature, that tax monies derived from the coal severance tax will be loaned from the in-state

- 11 -

investment fund and used to secure the obligations of the bonds. Such a procedure impermissibly offends the same provisions of the constitution we have referred to above.

This Court is aware that in Huber v. Groff (1976), 171 Mont. 442, 558 P.2d 1124, we held that the credit of the state was not pledged under the provisions of the Montana Housing Act of 1975. That act provides that the Board of Housing may issue bonds for the purchase of loans used for housing from banks and other financial institutions. We were careful to point out in Huber, however, that the act specifically said that the credit of the state was not pledged as security of the bonds so issued, even though there was a "moral commitment" much as we have at the case at bar, that the governor would request the legislature to appropriate necessary funds to supplement the reserve accounts. That avenue of redress for deficiencies, if any exist, in the capital reserve account and the economic development bond fund is still open under this decision. What we do not and cannot condone is the direct use of tax monies by legislative provision which in effect directly pledges the credit of the state to secure the bonds involved in this case.

VI.

There are a number of other issues raised by Hollow in his complaint, but what we have said foregoing is sufficient to demonstrate that the use of the in-state investment fund as provided in § 17-6-308, MCA, is constitutionally impermissible. We will not undertake to discuss the other issues raised by Hollow.

This opinion shall be and constitute a declaratory judgment in favor of Hollow to the effect that the use of

in-state investment funds to guaranty loans or to make loans to the capital reserve account and the economic guaranty fund as provided in § 17-6-308, MCA, is invalid under the Montana Constitution. This opinion, without the filing of further instruments or orders shall be and constitute such a declaratory judgment.

Except for activities related to the in-state investment fund, nothing in this opinion affects the validity of state actions through the capital investment fund or the economic development guaranty fund. Under Huber, supra, the "moral commitment" statutes of the latter two funds do not constitute a pledge of the state's credit to underpin the funds.

_John L. Shelby_
Justice

We concur:

_L. A. Turnage_
Chief Justice

_John Conway Harrison_

_Justices_

13

Mr. Justice Frank B. Morrison, Jr. dissents as follows:

I respectfully dissent.

I find no real problem with the procedural and factual discussion found in the majority opinion. My first disagreement begins with whether a guarantee is an investment or a debt.

In holding a guarantee to be a debt, the majority relies on Webster's definition of "investment" as being "the outlay of money usually for income or profit; capital outlay." Some reliance is also placed upon § 28-11-101, MCA, which provides a guarantor agrees to answer for the debt of another.

The majority fails to discuss the October 18, 1984, informal opinion of the Attorney General determining that a guarantee of a bond is a security and the purchase of a security is an investment; therefore, the guarantee of a bond is an investment. The opinion states:

> Neither "guarantee" nor "investment" is defined in the Montana Code. However, Black's Law Dictionary 741 (5th Ed. 1979), defines "investment" as "to purchase securities of a more or less permanent nature . . . Security is defined by the Montana Code as the guarantee of a bond. Section 30-10-103(11), MCA.

The majority opinion also ignores the obvious - there is less risk associated with a guarantee of a bond than with the issuance of a bond. The State may collect from a solvent principal any money expended by the State as guarantor. Furthermore, according to § 17-6-308(2), MCA, the guarantee must provide that the board is fully subrogated to the rights of the obligee under the bond. A bond is not a debt under § 17-5-1523, MCA. This was affirmed in Huber v. Groff (1976), 171 Mont. 442, 558 P.2d 1124. If a bond is not a debt surely a guarantee of a bond is not a debt.

Finally, a guarantee is a contingent liability. Doorly v. Butte and Western Silver Mines (1924), 71 Mont. 529, 533,

14

230 P. 779, 780. The guarantee depends on a future uncertain event, the failure of the principal to pay the debt. Contingent liabilities are not debts. In Hanson v. City of Havre, et al., (1941), 112 Mont. 207, 212, 114 P.2d 1053, 1056, this Court said:

> The possibility that part of the bonds may have to be paid with monies obtained from the revolving fund which in turn is created by a tax levy on the property of the city does not create a city debt but is merely an arrangement whereby the city, through the revolving funds, loans money to the district, and for which it holds security in the form of a lien.

The majority opinion finds the statutory scheme here at issue to be unconstitutional because:

> 1) It uses coal tax monies for private purposes, as opposed to public purposes;
>
> 2) It gives private individuals appropriations for industrial and benevolent purposes; and
>
> 3) It violates the Unified Investment program by allowing guaranties of private obligations.

This sweeping holding by the majority opinion is not supported by authority and runs contrary to well established law in this state. In Grossman v. State of Montana (1984), 682 P.2d 1319, we said:

> The constitutional provision is not violated because the legislature may in making appropriations or other provisions in some way benefit incidentally various private individuals, associations or corporations not under the control of the state. As long as the provisions relating to the expenditures of the funds derived from the proceeds of the bonds are under the control of the state, the constitutional mandate [No appropriations shall be made for religious, charitable, industrial, educational, or benevolent purposes to any private individual, private association, or private corporation not under control of the State] is satisfied.

Likewise, in Huber, supra, the appropriations were found to go to a public purpose despite benefit to private homeowners, because the Housing Board, which controlled the money, was a public corporation, not a private corporation.

15

We said: "It received all its powers directly from the legislature and its duties and responsibilities are set out clearly by the statute which created it." 171 Mont. at 457. The same can be said about the Montana Economic Development Board in this instance. Therefore, under relevant precedent, the purpose of the legislation is public, not private.

Likewise, the coal tax money is going to a public purpose. Our language in Grossman is instructive. We said:

> The question of whether a particular purpose for which taxes may be levied and collected is a public purpose is for the legislature in the first instance, and the courts will indulge every reasonable presumption in favor of the legislative decision in this respect. Lewis and Clark County v. Industrial Accident Board (1916), 52 Mont. 6, 155 P. 268.

Grossman, 41 St.Rep. at 822.

Unfortunately, the effect of the majority opinion casts serious doubt on whether any different program could pass constitutional muster.

The plaintiff contends that S.B. 349 is not a valid appropriation in that it does not specify a fixed amount of loans or guarantees that may be made by the Board and therefore does not comply with Article VIII, Section 14, of the 1972 Montana Consitution which provides:

> Except for interest on the public debt, no money shall be paid out of the treasury unless upon an appropriation made by law and a warrant drawn by the proper official in pursuance thereof.

Defendant argues that an appropriation by the legislature is not required to validly authorize the In-State Investment Fund to be invested in a guarantee or loan as contemplated by S.B. 349 in that an investment is neither a debt nor an expenditure.

Twenty-five percent of the coal severance tax trust fund constituting the in-state investment fund has been appropriated by act of the legislature. The defendant argues

16

that the investment thereof, as opposed to the expenditure of the principal, does not require an appropriation. I agree. Just as a legislative appropriation is not required each time the Board of Investments invests each of the funds subject to its control under the Unified Investment Progam, neither should one be required each time the Montana Economic Development Board purchases a loan or issues its guarantee.

The majority opinion fails to discuss the important constitutional issue of whether the legislature unconstitutionally delegated its authority to the Board in allowing it to set the limits of liability. The test is found in Douglas v. Judge (1977), 174 Mont. 32, 39, 568 P.2d 530, where this Court said:

> . . . a statute is complete and validly delegates administrative authority when nothing with respect to a determination of what is the law is left to the administrative agency, and its provisions are sufficiently clear, definite, and certain to enable the agency to know its rights and obligation.

Here the Board has been given specific guidelines for the investment of the in-state investment fund. Investments from the fund should:

> a) diversify, strengthen and stabilize the Montana economy,
>
> b) increase Montana employment and business opportunities,
>
> c) maintain a clean and healthful environment, and
>
> d) give preference to business investments that
>
> i) are for locally owned enterprised that are either expanding or establishing new operations;
>
> ii) provide jobs that will be substantially filled by Montana residents;
>
> iii) encourage or benefit the processing, refining, marketing and innovative use and promotion of Montana's agricultural products; or
>
> iv) benefit small and medium-sized businesses.

17

Section 17-6-309, MCA.

With respect to amounts, the Legislature has prohibited the use of the fund for:

a)   direct loans;

b)   investments that would result in one business enterprise receiving a benefit from or incurring a debt to the fund in excess of 10% of the prior fiscal year's coal severance tax revenue deposited in the fund; and

c)   participation in loans to an extent greater that 80% of the loan.

Sections 17-6-310 through 312, MCA.

I believe the guidelines are sufficiently definite and the delegation is lawful.   In Grossman v. State of Montana, supra, we said:

> Here the enactments of the legislature are complete and delegate to the Board of Natural Resources and Conservation and the Department of Natural Resources and Conservation administrative authority which is sufficiently clear, definite and certain to enable the agencies to know their respective rights and obligations. Huber v. Groff (1976), 171 Mont. 442, 558 P.2d 1124; Montana Milk Control Board v. Rehberg (1962), 141 Mont. 149, 376 P.2d 508. Determinations of economic and environmental feasibility are far more appropriate in the administrative sector than in the legislative branch. There is nothing improper, constitutionally or otherwise, in the legislature making its authorizations contingent upon administrative decisions properly made in the executive side of the state government.

I find Grossman to be controlling here.   We should determine that the delegation of authority is constitutional.

The plaintiff had the burden of persuasion in this case. He must show beyond a reasonable doubt that S.B. 349 violates some specific requirement of the Montana Constitution.   If the constitutionality of an act is doubtful the court should resolve all doubts in favor of the validity of the act. Tipton v. Erickson (1933), 93 Mont. 446, 19 P.2d 227.   The only troublesome feature I find is administrative rule,

18

A.R.M. § 8.97.413. After quoting the administrative rule the majority opinion states that:

> The potential liability of the state is for the full amount of all guaranties made by the Board which can be as great as two times the amount of the in-state investment fund.

The administrative rule can not invalidate the statutory scheme. The heavy presumption in favor of constitutionality has not been overcome by plaintiffs. If the majority wished to find the administrative rule to be an improper construction of the statutes it should have done so but should have preserved the integrity of the statutes themselves.

Under previous decisions of this Court herein cited the basic statutory framework passes constitutional muster. I would issue a declaratory judgment upholding the statutory scheme.

Justice

19