229 P.3d 774 (2010)
SEIU HEALTHCARE 775NW, Petitioner,
v.
Governor Christine GREGOIRE, Respondent.
No. 82551-3.
Supreme Court of Washington, En Banc.
Argued March 10, 2009.
Decided April 8, 2010.
*775 Dmitri L. Iglitzin, Robert H. Lavitt, Schwerin Campbell Barnard, Iglitzin & Lavitt, Seattle, Judith R. Krebs, General Counsel, for Petitioner.
Robert M. McKenna, Maureen A. Hart, Stewart Arthur Johnston, Janetta Elizabeth Sheehan, Attorney General's Office, for Appellee.
J.M. JOHNSON, J.
¶ 1 SEIU Healthcare 775NW (SEIU) filed a petition for a writ of mandamus to compel Governor Christine Gregoire to revise the budget she submitted to the legislature pursuant to RCW 74.39A.300 so as to include funds to implement pay increases for 25,000 in-home personal care providers awarded by an arbitrator. Such budget revision would necessarily require the governor to reduce or remove other budgetary items to balance the petitioner's demands. These redistributive budgetary decisions require that the governor exercise discretion and judgment as an independent constitutional officer. Since the budget revision sought by SEIU is discretionary rather than a ministerial duty, issuance of a writ of mandamus is inappropriate and we accordingly dismiss the petition.
¶ 2 Moreover, even if mandamus were an appropriate remedy in this case, we could not fully grant the relief sought by the petitionera change in the 2009-2011 biennial budget already adopted by the legislature and signed by the governor. We therefore alternatively dismiss the petition on mootness grounds.

FACTS
¶ 3 An agreed statement of facts (hereinafter ASF775) and appendices thereto (JSF775) were submitted to this court by the parties on January 27, 2009.[1] In summary, the facts and events that led to the controversy are as follows:
¶ 4 SEIU acts as the exclusive bargaining representative for approximately 25,000 individual providers who independently contract *776 with the state government to provide in-home personal care services to Medicaid-eligible clients. ASF775 ¶ 1. These providers are considered state employees solely for the purpose of collective bargaining under chapter 41.56 RCW. Id.; see also RCW 74.39A.270(1).[2] SEIU and the Washington State Labor Relations Office (LRO), a division of the Washington State Office of Financial Management (OFM), began bargaining for SEIU's 2009-2011 labor contract in April 2008. ASF775 ¶ 4. Although the parties were able to agree on many contractual issues, ASF775 ¶ 4, Ex. 3 (JSF775, at 0008-25), they certified others for interest arbitration after reaching an impasse on those issues, id. Ex. 1 (JSF775, at 0002-03). Among the disputed issues were the compensation and fringe benefits provisions of the collective bargaining agreement. Id. Ex. 1 (JSF775, at 0002).
¶ 5 An interest arbitration hearing occurred over several days in August and September 2008. Id. Ex. 2, at 2 (JSF775, at 0006). During the hearing, the deputy director of OFM, Wolfgang Opitz, testified to the worsening revenue outlook for the state, which he described as "disconcerting" at best, even without the relevant collective bargaining agreement and arbitration award expenditure increases. Id. Ex. 4, at 607 (JSF775, at 0037).[3] The arbitrator issued his opinion and award on October 1, 2008. Id. ¶ 8, Ex. 10 (JSF775, at 0287-386). Despite acknowledging concerns regarding the government's ability to fund the burden of any further cost increases, id. Ex. 10, at 18 (JSF775, at 0304), the arbitrator awarded wage increases and benefit expansions, id. Ex. 10, at 32-37 (JSF775, at 0318-23), 39 (JSF775, at 0325), 50-53 (JSF775, at 0336-39), 83-84 (JSF775, at 0369-70). The membership of SEIU voted on November 14, 2008 to approve the labor agreement reflecting the arbitrator's award. Id. ¶ 11.
¶ 6 However, on December 17, 2008the day before the governor submitted her proposed budget to the legislature, id. ¶ 15the director of OFM submitted a memorandum explaining that the SEIU agreement was not financially feasible for the state and informing the governor that she therefore was prohibited from including it in her budget proposal. Id. Ex. 14 (JSF775, at 0531-32).[4] Accordingly, the governor's budget proposal did not include a request for funding to implement compensation and benefit increases for the members of SEIU, neither those awarded by the arbitrator nor those that had been agreed during negotiations. Id. ¶ 16. The director of LRO informed SEIU of the results of the feasibility assessment on the same day that the governor submitted her biennial budget to the legislature. Id. ¶ 14.
¶ 7 On December 29, 2008, SEIU filed an original action in this court requesting a writ of mandamus compelling the governor to *777 withdraw the budget submitted to the legislature and revise it to include funding for all compensation and benefit increases under the SEIU arbitration award and agreement. Br. of Pet'r at 2. In its briefing, the petitioner argued that RCW 74.39A.300(1) creates a mandatory and nondiscretionary duty on the part of the governor to request such funding in her biennial budget proposal to the legislature. Id. at 1-2.[5]
¶ 8 In response, the State (on behalf of the governor) argued that, since the creation of the budget required the exercise of discretion on the part of the governor, the duty was neither mandatory nor ministerial, and therefore the constitutional remedy of mandamus was inappropriate. Br. of Resp't at 22-23. The State also reasoned that the duty was not compulsory because the director of OFM had not certified the collective bargaining agreement as financially feasible and the arbitration decision was not binding. Id. at 22. The parties submitted an agreed statement of facts to this court, see supra p. 2, and it is on the basis of its content and the briefing of the parties that we enter judgment denying the writ and dismissing the petition.

ANALYSIS

I. The Writ of Mandamus

¶ 9 This court has express constitutional authority to issue mandamus directed to state officers as provided by article IV, section 4 of the state constitution. However, such a court order must be justified as an extraordinary remedy. Walker v. Munro, 124 Wash.2d 402, 424, 879 P.2d 920 (1994). Accordingly, we have placed strict limits on the circumstances under which we will issue the writ to public officers and held that "mandamus may not be used to compel the performance of acts or duties which involve discretion on the part of a public official." Id. at 410, 879 P.2d 920.
¶ 10 An early case in this court held that acts of public officers must be "ministerial" to be subject to mandamus, clarifying the term:
"[W]here the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment, the act is ministerial; but where the act to be done involves the exercise of discretion or judgment, it is not to be deemed merely ministerial." State v. City of Seattle, 137 Wash. 455, 461, 242 P. 966 (1926) (emphasis added) (quoting 18 Ruling Case Law (Mandamus) at 116). It follows that even a mandatory duty is not subject to mandamus unless it is also ministerial, or nondiscretionary, in nature.[6]See R.E. Heinselman, Annotation, Mandamus to Governor, 105 A.L.R. 1124, 1128 (1936) ("it does not necessarily follow that, because a duty imposed is mandatory, it is also ministerial"); accord Brown v. Owen, 165 Wash.2d 706, 725, 206 P.3d 310 (2009) ("Where we find a mandatory duty, we must further determine whether that duty is ministerial or discretionary in nature." (emphasis added)).
*778 ¶ 11 The inclusion of substantive spending items in the governor's budget is clearly not a ministerial act. The governor is required by the constitution and by state law to submit a balanced budget to the legislature. See RCW 43.88.030(2) (requiring revenues plus existing surplus to equal or exceed proposed expenditures). The legislation underlying the contract at issue contains no funding source to implement the compensation or benefits provisions of any collective bargaining agreement negotiated by the parties or imposed in the course of arbitration. See Laws of 2002, ch. 3, § 9 (Initiative Measure No. 775, approved Nov. 6, 2001). Thus, the allocation of funds for obligations in the governor's budget necessarily requires a decision by the governor to remove funding from other priorities in the budget.[7]
¶ 12 Deciding the allocation of limited state funds in order to achieve the statutorily required balanced budget necessarily involves the exercise of the governor's discretion. We have held that a discretionary act "involves the exercise of discretion or judgment...." State ex rel. Linden v. Bunge, 192 Wash. 245, 249, 73 P.2d 516 (1937); accord Brown, 165 Wash.2d at 725 n. 10, 206 P.3d 310; see also Burg v. City of Seattle, 32 Wash.App. 286, 291, 647 P.2d 517 (1982) (a discretionary act is one that "`is essential to realization of the policy ... of the officer'" (quoting Moloney v. Tribune Pub'g Co., 26 Wash.App. 357, 360, 613 P.2d 1179 (1980))). It is difficult to imagine an act more essentially a policy decision for the governor than the submission to the legislature of a budget during an economic downturn. The creation and submission of a budget proposal is clearly one of those discretionary acts that are "in their nature political, or which are, by the constitution and laws, submitted to the executive," and inappropriate for mandamus. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803).[8]
¶ 13 Even if mandamus were a suitable remedy, we would necessarily exercise judicial discretion and refuse to issue the writ here. A mandamus action lies in equity, and the court may refuse to grant relief where private rights would be unwisely advanced at the expense of public interests. See R.T.K., Annotation, Court's Control Over Mandamus as Means of Avoiding the Enforcement of Strict Legal Right to the Detriment of the Public, 113 A.L.R. 209 (1938) (surveying cases from 28 states recognizing this principle). The recent severe economic difficulties faced by our state present circumstances dictating such judicial restraint.[9]
¶ 14 The writ requested would require the governor to include in her biennial budget pay raises that most state workers neither receive nor support, and that the legislature chose not to fund in the adopted budget. See ASF775 Ex. 17 (JSF775, at 0569-717). Such pay increases will almost certainly go unfunded again. Indeed, our ever-worsening economy may ultimately require some pay reductions rather than pay raises. The time and money likely expended to respond to a writ issued by the court would be wasteful of public resources at a time when our state government is struggling to maintain the basic public services upon which all state residents rely, and when the costs of our increasingly needed social safety net programs are rising dramatically.[10] Equity thus strongly *779 counsels against issuing the writ even were mandamus an appropriate remedy.

II. Justiciability Requirement

¶ 15 There is an additional ground requiring that we refrain from issuing the writ sought by the petitioner in this case. We have previously declined to entertain a mandamus action against the governor that did not meet our justiciability requirements. See, e.g., State ex rel. Lemon v. Langlie, 45 Wash.2d 82, 94, 273 P.2d 464 (1954) (dismissing mandamus action against governor for lack of a genuine controversy). Similarly, because the relief sought by the petitioner herea change in a budget proposal long since submitted for a budget already adopted by the legislatureis no longer available, this case runs afoul of our mootness doctrine. Leaving aside important constitutional problems with respect to the separation of powers raised by the application of mandamus to this case, we also decline to issue the writ requested by SEIU for this alternative reason.
¶ 16 A case is moot if a court can no longer provide effective relief. In re Recall Charges Against Seattle Sch. Dist. No. 1 Dirs., 162 Wash.2d 501, 505, 173 P.3d 265 (2007) (action challenging recall petition moot because school board members to be recalled would no longer be in office when petition put to vote); see also City of Sequim v. Malkasian, 157 Wash.2d 251, 259, 138 P.3d 943 (2006) ("`The central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief.'" (quoting 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3533.3, at 261 (2d ed.1984))).
¶ 17 The petitioner in this case specifically requested that we enter a writ ordering the governor "to submit within five days of this Order a revised balanced budget to the Legislature that includes funding ... for the 2009-11 collective bargaining agreement...." Br. of Pet'r at 24. But "[t]his court has uniformly held that it will not compel by mandamus the doing of an act that would serve no useful purpose, nor should a writ issue when ... compliance with the mandate could have no operative effect." City of Tacoma v. Rogers, 32 Wash.2d 729, 733, 203 P.2d 325 (1949). That is, our "[c]ourts should ... refrain from requiring the performance of useless or vain acts." Vashon Island Comm. for Self-Government v. Wash. State Boundary Review Bd., 127 Wash.2d 759, 765, 903 P.2d 953 (1995) (citing Neilson v. Vashon Island Sch. Dist. 402, 87 Wash.2d 955, 960, 558 P.2d 167 (1976)).
¶ 18 The relief sought by the petitioner is no longer available because the legislature has adopted and the governor has signed the 2009-11 biennial budget and the 2009 legislature has adjourned.[11] This lapse of time has foreclosed the opportunity for meaningful relief and rendered the writ sought by SEIU ineffective. 55 C.J.S. Mandamus § 15, at 32-33 (2009). The petitioner did not request alternative relief such as an order calling the legislature into a special session to decide the issue of funding for its contractwhich would itself be unconstitutional, given that only the governor and the legislature have that power, Wash. Const. art. II, § 12; art. III, § 7. Nor did the petitioner request the issuance of a writ applicable to the next biennial budget or supplemental budget should our decision come after the legislature adjourned.[12] Accordingly, it would be unavailing for this court to grant the writ as requested.
*780 ¶ 19 Only if we were to sua sponte modify the relief sought by SEIU from a mandamus order affecting the 2009-2011 budget to a prospective order could we achieve the result that the petitioner desires. However, as noted above, SEIU did not seek this prospective relief. "We have held that the writ cannot be any more specific than the petition." Walker, 124 Wash.2d at 423, 879 P.2d 920 (citing State ex rel. Pacific Am. Fisheries v. Darwin, 81 Wash. 1, 12, 142 P. 441 (1914)). Hence, "[w]ithout a request in the petition for a specific writ ... we will not, on our own, craft such a remedy," id., and in keeping with this precedent we will not here order the governor to include the relevant funding request in time for future legislative sessions.
¶ 20 The most recent state budget forecasts show continued revenue declines.[13] Ordering that the governor include a request for more funding in her proposed supplemental budget, in addition to exceeding the scope of the relief requested by the petitioner, would also likely be a meaningless exercise. Thus, even if we were to craft a remedy in contravention of the well-established principle that a writ of mandamus cannot be more specific than the petition, it is not likely that a court-enforced budgetary request would actually be funded by the legislature. Since we do not issue writs of mandamus to compel useless or vain acts or acts that have no operative effect, see supra pp. 12-13, 142 P. 441, rewriting the writ so as to grant prospective reliefrelief that is both premature and unrequestedis improper.
¶ 21 We therefore alternately conclude that the petition for the writ as requested is moot and deny the petition on this ground.

CONCLUSION
¶ 22 We hold that amending a budget submitted by the governor in order to increase compensation and benefits for one group of state employees necessarily requires the exercise of discretion by the executive and consequently is not subject to the constitutional remedy of a writ of mandamus. This conclusion is inescapable when one recognizes that other budget allocations must be cut or eliminated in order to accommodate such an amendment. Furthermore, by the date of today's decision, the petition will be moot because we can neither grant the relief that SEIU requests nor sua sponte amend that request to a prospective order in the face of even greater budget deficitsa remedy which, in any case, has no place in our mandamus jurisprudence. We therefore dismiss the petition.
WE CONCUR: CHARLES W. JOHNSON, GERRY L. ALEXANDER, DEBRA L. STEPHENS and TOM CHAMBERS, JJ.
MADSEN, C.J. (dissenting).
¶ 23 The majority says that mandatory inclusion of one item in a proposed budget requires the governor to exercise discretion in reducing or eliminating other requests, and therefore mandamus is improper. There is, of course, a fixed amount of funding available to achieve a balanced budget and one budget request included in a proposed budget means that there is less money remaining for other proposed requests. But this fact does not turn a mandatory duty into a discretionary one. Pursuant to a state law duly enacted by the legislature, the governor had a mandatory duty to include in the proposed 2009-2010 budget a request to fund the arbitration award in this case.
¶ 24 In this state, the legislature and the governor each has powers and responsibilities with respect to the budget, and neither alone has unlimited discretion as to what must be, as opposed to may be, included. *781 The flaw in the majority's analysis is that it fails to recognize that while the governor has broad discretion with respect to proposed budget matters, the governor does not have discretion with respect to constitutionally or statutorily mandated items that must be included in the proposed budget.
¶ 25 This does not mean, contrary to the impression that the majority leaves, that the request to fund an arbitrator's award must or will in fact be funded. There is no statutory requirement that the legislature has to approve the request. Rather, the statute assures that the question of funding receives due consideration by the legislature when it enacts a budget. When times are as economically difficult as they are now, the mandate that this request be made is unlikely to mean that the legislature will include such funding in the budget bill it enacts, and if the legislature did act to fund the request, the governor still retains the veto power.
¶ 26 The majority's discussion of the present economy is therefore inappropriate. It is inappropriate for another reason as well. The majority actually says that even if mandamus were a suitable remedy, it would refuse to grant the writ because of the economic straits facing the State! This is a declaration of power that this branch of government does not have. We are not the legislature, and the court has no business upsetting the balance of powers between the executive and the legislative branches, no matter whether the members of this court think a particular budget item is wise or foolish. The other branches of government must carry out their constitutional and statutory duties without interference by this court. The legislature enacted a statute requiring, under the circumstances in this case, that the governor include a budget request to fund the arbitrator's award. It is not for this court to rewrite the statute because it does not think difficult economic times.
¶ 27 In short, this case is not about forcing a misappropriation of state funds in hard times, and it certainly is not about the degree of discretion that the governor has with respect to budget matters that are not mandated by statute or the constitution. It is about following the lawa duly enacted state statutethat required that the request be included in the governor's proposed budget.
¶ 28 It is important to bear in mind that there are numerous other statutes mandating other specific duties that the governor must carry out with respect to a proposed budget. Absent a showing that a statute is unconstitutional (a showing that has not been made here), our obligation is to see that the laws are enforced as they are written. Unfortunately, the majority's approach is to permit complete disregard for the law. Regardless of this particular dispute and current economic times, the majority opinion means no less than that any governor may flout any law regarding any mandatory budget requirement and absolutely nothing can be done about it.
¶ 29 Because this is a matter of great importance that is subject to recurrence whenever the law requires that a request be included in the governor's proposed budget, this case should be decided regardless of mootness.
¶ 30 Finally, an important fact mentioned nowhere in the majority is that the governor was a party to the collective bargaining agreement at the heart of this case, with the Washington State Labor Relations Office (LRO) acting on her behalf. It was her contract, and she should not have been allowed to repudiate it in contravention of state law.

Facts
¶ 31 Assuming the issues in this case should be decided on the merits,[1] my description of the facts is necessarily more complete than that presented in the majority.
¶ 32 Petitioner SEIU Healthcare 775NW (SEIU 775NW or the union) is the exclusive bargaining representative for approximately 25,000 individual providers who independently contract with the State Department of Social and Health Services to provide in-home personal care to Medicaid-eligible *782 clients. Agreed Statement of Facts (ASF775) ¶ 1.[2] This long-term care services option allows elderly and disabled persons to receive personal care assistance in a residential setting, as an alternative to institutional care. SEIU 775NW sought a writ of mandamus directing Governor Christine Gregoire to submit a revised 2009-2010 budget to the legislature that included requests for funding to implement the compensation and benefit provisions of its collective bargaining agreement (CBA), determined through mandatory interest arbitration.
¶ 33 By statute, the governor is designated the public employer of the individual providers and the governor or the governor's designee is charged with engaging in collective bargaining with the individual providers' union. RCW 74.39A.270(1). Under the statutory scheme, the parties are subject to collective bargaining provisions in chapter 41.56 RCW, including the mandatory interest arbitration provisions of this chapter (with certain exceptions). RCW 74.39A.270(2)(c). By law, if the parties reach impasse on a subject of negotiation, that issue will go to mandatory interest arbitration and a decision of the arbitration panel is final and binding on the parties. Id.; RCW 41.56.440, .450, .480. An important component of the interest arbitration statutes is that the arbitrator must consider the parties' evidence on the State's ability to pay, RCW 41.56.465(5)(a)(ii), and make an award corresponding to that ability.
¶ 34 The LRO, a division of the Office of Financial Management (OFM), represented the governor in collective bargaining with the union. OFM is a division of the governor's office. RCW 43.41.050. LRO and SEIU 775NW negotiated the compensation and fringe benefits terms at issue to impasse thus triggering the requirement that an arbitrator would have to decide what these terms would be. After the parties reached impasse, an interest arbitration hearing was held, and LRO submitted extensive evidence about the economic circumstances and revenue downturn affecting the State's ability to pay.
¶ 35 During the hearing, the arbitrator, Timothy Williams, heard from 28 witnesses and admitted 142 exhibits into evidence. Pursuant to RCW 41.56.465(5)(a)(ii), an arbitrator deciding issues for employees under RCW 74.39A.270 must consider "[t]he financial ability of the state to pay for the compensation and fringe benefit provisions of a collective bargaining agreement." LRO introduced testimony and exhibits relating to the financial condition of the State and the potential impact of any interest arbitration award on the state budget. ASF775 ¶ 7. OFM Deputy Director Wolfgang Opitz testified that based on the most recent Economic and Revenue Forecast Council report and projections prepared by the Senate Ways and Means Committee staff, there would be a $2.7 billion shortfall for the 2009-2011 biennium, which would be reduced to $1.956 billion if the State's "rainy day" fund was spent. ASF775 Ex. 4, at 615 (JSF775 0045[3]); Ex. 8, at JSF775 0280.
¶ 36 The arbitrator considered the substantial evidence that the governor's representative submitted on the issue of the State's ability to pay and factored it into his award, which was issued on October 1, 2008. The arbitrator emphasized that "clearly, the most significant problem faced by both the State and the Union with regard to completing the 09-11 collective bargaining agreement is the concern with the State's ability to pay for any increased costs." ASF775 Ex. 10, at JSF775 0304. He noted the award was "being written at a time when the front page of every newspaper carries the message that we are in the midst of one of the darkest times in the history of American financial markets" and that "[t]his cannot bode well for the financial well being of the State of Washington." Id. He then said, "To put it bluntly, the award is not a rich one." Id. He said that "he found merit in many of the Union's proposals but ultimately ... determined not to award the provisions solely on *783 the basis of cost." Id. He called the "projected budget shortfall" "the dominant factor" in the award related to wages. Id. at JSF775 0320. The arbitrator awarded an approximately 2.4 percent increase to take effect in July 2009 and a 2.0 percent increase in July 2010. Id. at JSF775 0318-19. The union membership voted to ratify the contract. ASF775 ¶ 11.
¶ 37 RCW 74.39A.300 is the state statute that requires that the governor include the arbitration award in the proposed budget to the legislature. RCW 74.39A.300(1) states that the governor must submit a budget request for funds to implement compensation and fringe benefits provisions of a CBA entered into under RCW 74.39A.270 (or she must propose legislation necessary to implement such an agreement). RCW 74.39A.300(2) provides that (a) a request for such funds must have been submitted to the director of OFM by October 1 of the year prior to the legislative session when the request will be considered and (b) the request must have "been certified by the director of financial management as being feasible financially for the state or reflects the binding decision of an arbitration panel." (Emphasis added.) LRO timely submitted a copy of the arbitration decision and a summary of the costs of the arbitration award, plus costs associated with monetary issues that were successfully negotiated without interest arbitration, to the OFM director. ASF775 ¶ 9.
¶ 38 In November 2008, the Economic and Revenue Forecast Council issued a quarterly report that stated that economic conditions had "deteriorated sharply" and reported "[v]ery weak revenue collections" with an expectation of "a sharp decline in consumer spending ... so the impact on state revenues will be more severe" than during the downturn in 2001. ASF775, Ex. 12, at JSF775 0406. The revenue forecast was $1.4 billion lower than it had been two months earlier, and $1.65 billion lower than predicted in June. On December 4, 2008, the Senate Ways and Means Committee produced a report predicting that including the shortfall for the current biennium, the total budget including the State's "rainy day" fund of $700 million. ASF775 Ex. 13, at JSF775 0521.
¶ 39 On December 17, 2008, the director of OFM advised Governor Gregoire that the collective bargaining agreements and arbitration awards that had been submitted to hima total of 33 agreements that included the SEIU 775NW agreementwere not feasible financially for the State and therefore could not be included in the proposed budget. ASF775 Ex. 14, at JSF775 0532.[4]
¶ 40 Also on December 18, 2008, the governor submitted her proposed biennial budget to the legislature.[5] By law, the governor must propose a balanced budget. The budget the governor submitted did not include a request for funding to implement compensation and fringe benefit increases decided through arbitration or funding to implement compensation or money contributions to which the parties agreed. ASF775 ¶ 16.[6]
¶ 41 On December 29, 2008, SEIU 775NW filed an original action in this court seeking a peremptory writ of mandamus compelling the governor to withdraw the budget she had submitted to the legislature and submit a revised balanced budget to the legislature that included funding and legislative authorization for its CBA. It is, of course, too late for this court to provide the relief requested, but the issue here, and more specifically the issue of the extent of the governor's discretion with respect to items that are statutorily required to be included in the proposed budget, is of such importance that the court should decide all of the issues presented in this case.

Analysis

I
¶ 42 SEIU 775NW contends the governor failed to carry out a mandatory statutory *784 duty to include in her proposed budget submitted to the legislature a request for funding the arbitrated compensation and fringe benefits provisions in the individual providers' CBA. The State contends that a writ of mandamus is improper because the governor has discretion as to what is included in the budget document, limited only by the state constitution. Unfortunately, the majority agrees with the State. However, both the executive and the legislative branches of government are involved in development and adoption of the state budget. The governor does not have unlimited discretion as to what the budget will contain.
¶ 43 The State relies on article III, section 6 of the Washington State Constitution, which provides that the governor "shall communicate at every session by message to the legislature the condition of the affairs of the state, and recommend such measures as he shall deem expedient for their action," and on the budget and accounting act of 1959, Laws of 1959, ch. 328, chapter 43.88 RCW, in particular RCW 43.88.030. The State also urges that the word "must" in RCW 74.39A.300(1) has to be construed to be permissive in order to preserve this discretion and to avoid constitutional infirmity. See Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council, 165 Wash.2d 275, 299, 197 P.3d 1153 (2008).
¶ 44 Contrary to the State's argument, article III, section 6 is not infringed by construing the word "must" in RCW 74.39A.300(1) as mandatory. Under our state government, the legislative branch enacts the laws and also determines the State's final budget and for what purposes appropriations will be made, subject to the governor's veto. See Const. art. II, § 1; art. VIII, § 4; art. III, § 12; Dicomes v. State, 113 Wash.2d 612, 622, 782 P.2d 1002 (1989) (under the budget and accounting act "funds are `appropriated' upon adoption of a budget by the Legislature[,] RCW 43.88.080"). In enacting the statutory scheme at issue, the legislature obviously wanted the question of funding individual providers' CBAs brought to its attention in the budget document, once it had been determined that the State could pay. To this end, it mandated that the governor include a funding request in her budget. The legislature also had in mind the importance of a determination that the State has the ability to pay for compensation and fringe benefits provisions in the CBAs. The legislature ensured that the executive branch's evidence of financial feasibility will be considered, either at the time of interest arbitration or by the director of OFM if the parties successfully negotiate the compensation and fringe benefit provisions. Financial feasibility continues to be a consideration as the legislature determines what the final state budget will be and whether it will make appropriations for the compensation and fringe benefit provisions in the individual providers' CBA, and as the governor decides whether to exercise the veto power.
¶ 45 As I emphasized at the outset of this 10 opinion, inclusion of the request in the proposed budget does not mean that the request for these funds will be approved; indeed, in the economic environment prevailing when the legislature considered the 2009-2011 budget, it was unlikely to have been approved.
¶ 46 Our state constitution does not contain a separation of powers clause, but the division of our state government into different branches has been presumed throughout this state's history to give rise to a separation of powers doctrine. Brown v. Owen, 165 Wash.2d 706, 718, 206 P.3d 310 (2009). The separation of powers doctrine primarily serves to ensure that the fundamental functions of each of the branches of government remain inviolate. Id. Each branch is allowed to exercise limited control over the others in the form of checks and balances. Id. at 720, 206 P.3d 310. As we have often explained, the overlapping of functions among the three branches of government "allows for the scheme of checks and balances which ... evolved side-by-side with and in response to the separation of powers concept. Legislative control over appropriations, the executive power to veto, and the judicial authority to declare legislative and executive acts unconstitutional are all examples of direct control by one branch over another." In re Salary of Juvenile Dir., 87 Wash.2d 232, 242-43, 552 P.2d 163 (1976) *785 (citations omitted) (emphasis added). The separate branches of government are not hermetically sealed and some overlap must exist; one branch of government may be involved in functions of another branch or in functions that overlap functions of another branch without violation of the separation of powers doctrine so long as the first branch does not undermine the operation of the other branch or the rule of law that all branches must maintain. Carrick v. Locke, 125 Wash.2d 129, 135, 882 P.2d 173 (1994); see Juvenile Dir., 87 Wash.2d at 241-43, 552 P.2d 163.
¶ 47 In the context here, the executive branch negotiates the CBAs and with respect to negotiated terms makes a direct determination of financial feasibility. With respect to arbitrated terms, the executive branch produces evidence as to whether the State is in a position to fund them. Once a determination of feasibility is made according to the requirements of the statute, then, pursuant to the legislature's statutory mandate, a budget request for funding must be made. This mandate does not result in an unconstitutional encroachment on gubernatorial powers.
¶ 48 As the Montana State Supreme court explained, in a similar case, there are areas in which "common links" of connection or dependence occur between branches of state government, and budgeting is one such common link. Huber v. Groff, 171 Mont. 442, 455, 558 P.2d 1124 (1976). The court explained that under Montana's scheme, "[t]he executive depends on the legislature for funding and because the legislature must set the state's budget in a ninety day session every other year, and because this is a period when there are numerous other matters to attend to, the legislature must also rely on the executive to provide the information it needs to budget intelligently." Id. Under the Montana constitution and statutes, the governor has to submit a budget in a certain form with specified contents and is prohibited from altering any legislative appropriation request. Id. The court concluded that there was no constitutionally prohibited invasion on the executive's power when the legislature required by statute that the governor include certain fund requests in the budget.
¶ 49 As in Montana, in Washington the 12 executive branch depends upon the legislative branch for funding. Like Montana's, our state legislature has 90 days to adopt the final budget and attend to other matters, and relies on the governor to provide information to budget intelligently and also to assist it in achieving a budget in accord with its own legislation involving funding matters. Also, as explained next, the governor must include "statutory expenditures" in her budget and must submit her budget in a certain form with specified content. Like the court concluded in Huber, there is no invasion into the executive's powers as a result of the requirement that the governor include the budget request mandated by the plain language of RCW 74.39A.300(1).
¶ 50 Turning to the budget and accounting act, upon which the State also relies, it is true that the act lodges a great deal of discretion in the governor. SEIU 775NW does not dispute this. However, the act requires that the budget document be submitted to the legislature in a particular form and specifies matters that must be included in the budget document. RCW 43.88.030. It specifically constrains the governor's exercise of discretion and, contrary to the State's claim, these constraints are not all constitutionally based. For example, the governor must include in the budget document "[p]ayments of all reliefs, judgments, and claims." RCW 43.88.030(2)(b). The act also provides that other "statutory expenditures" must be included. Id. at (2)(c). This subsection expressly contemplates that expenditures mandated by the legislature must be included. Both of these provisions have been in the act since it was enacted and, significantly, the State does not contend that any portion of the budget and accounting act is unlawful.[7]
*786 ¶ 51 Contrary to the State's argument, it is not necessary to interpret "must" in RCW 74.39A.300(1) as permissive to avoid encroachment on the governor's discretion. In the area of the budget, the governor and the legislature both have power, and the governor's discretion must be considered in light of powers granted to the legislative branch, which has the power and the duty to make appropriations necessary to implement state policy and programs, among other things.
¶ 52 Ultimately, whether any appropriation is made is up to the legislature, subject to gubernatorial veto. If economic conditions change between the time an interest arbitrator determines the State can pay an arbitration award and the time when a proposed budget is submitted to the legislature, or even later, the legislature can consider the changed conditions when it decides what will be included in the final budget and what appropriations will be made, and the governor can consider it when deciding whether to exercise the veto power.

II
¶ 53 As is apparent, the parties disagree about the interpretation to be given the relevant statutes, in particular, RCW 74.39A.300, and about whether a writ of mandamus should issue.
¶ 54 Mandamus is an extraordinary writ. Walker v. Munro, 124 Wash.2d 402, 407, 879 P.2d 920 (1994). This court has original, nonexclusive, discretionary jurisdiction in mandamus as to all state officers. Const. art. IV, § 4; RAP 16.2(a); Staples v. Benton County, 151 Wash.2d 460, 464, 89 P.3d 706 (2004); Walker, 124 Wash.2d at 407, 879 P.2d 920. Mandamus is an appropriate remedy to compel performance of a specific, existing duty that a state officer has violated and continues to violate. Walker, 124 Wash.2d at 408, 879 P.2d 920. "A mandatory duty exists when a ... statute directs a state officer to take some course of action." Brown, 165 Wash.2d at 724, 206 P.3d 310. Mandamus may not be used to compel performance of duties that involve a public official's discretion. Walker, 124 Wash.2d at 410, 879 P.2d 920; RCW 7.16.160 (the writ is appropriate only where a state officer fails to perform "an act which the law especially enjoins as a duty resulting from an office").
¶ 55 The governor has a specific mandatory duty to include requests in the budget to the legislature for funds necessary to implement the union's CBA. RCW 74.39A.300 states in part:
(1) Upon meeting the requirements of subsection (2) of this section, the governor must submit, as part of the proposed biennial or supplemental operating budget submitted to the legislature under RCW 43.88.030, a request for funds necessary to administer chapter 3, Laws of 2002 and to implement the compensation and fringe benefits provisions of a collective bargaining agreement entered into under RCW 74.39A.270 or for legislation necessary to implement such agreement.
(2) A request for funds necessary to implement the compensation and fringe benefits provisions of a collective bargaining agreement entered into under RCW 74.39A.270 shall not be submitted by the governor to the legislature unless such request:
(a) Has been submitted to the director of financial management by October 1st prior to the legislative session at which the request is to be considered; and
(b) Has been certified by the director of financial management as being feasible financially for the state or reflects the binding decision of an arbitration panel reached under RCW 74.39A.270(2)(c).[8]
(Emphasis added.)
¶ 56 The two statutory prerequisites are met if the request for funds has been submitted *787 to OFM and either the director of OFM certifies it as being financially feasible or the request reflects a binding arbitration decision. The "or" in the statute is disjunctive, requiring either the director's determination of feasibility or a binding arbitration decision. See, e.g., Tesoro Ref. & Mktg. Co. v. Dep't of Revenue, 164 Wash.2d 310, 319, 190 P.3d 28 (2008); State v. Tiffany, 44 Wash. 602, 603-04, 87 P. 932 (1906). A determination of financial feasibility by the director of OFM is not required when there is a binding arbitration decision. Under the governing statute, the State's ability to pay is accounted for in an arbitration decision where the arbitrator must take into account evidence of the state's financial ability to pay. RCW 41.56.465(5)(a)(ii).
¶ 57 Once the two prerequisites are satisfied, the word "must" in RCW 74.39A.300(1) ("the governor must submit") is mandatory and the governor is required to include a request for funding in the budget document to the legislature. See Graham Thrift Group, Inc. v. Pierce County, 75 Wash.App. 263, 267, 877 P.2d 228 (1994). The State's contention that an arbitration decision is not binding until the legislature approves the funding is based on the fact that the arbitration provisions of RCW 41.56.430 through.470 and RCW 41.56.480 apply except that "[t]he decision of the arbitration panel is not binding on the legislature and, if the legislature does not approve the request for funds necessary to implement the compensation and fringe benefit provisions of the arbitrated collective bargaining agreement, is not binding on the authority or the state." RCW 74.39A.270(2)(c)(ii).[9] The State urges that under these statutes an arbitration decision is not binding on the State unless the legislature has approved funding, and because this has not occurred, the arbitrator's decision is not a "binding decision of an arbitration panel" for which the governor must request funding in the budget.
¶ 58 When the language of a statute is plain and unambiguous, the court is to give effect to that plain language as the expression of the legislature's intent. Tingey v. Haisch, 159 Wash.2d 652, 657, 152 P.3d 1020 (2007). The plain meaning of a statutory provision is determined from the ordinary meaning of the language at issue, the statutory context, related statutory provisions, and the statutory scheme as a whole. Id. The court considers the general object to be considered and the consequences that would ensue if a statute is read in a particular way. State v. Krall, 125 Wash.2d 146, 148, 881 P.2d 1040 (1994).
¶ 59 RCW 74.39A.270(2)(c)(ii) says that the arbitrator's decision is not binding on the legislature, the authority, or the State until approved by the legislature. But the mediation and arbitration provisions of RCW 41.56.430 through .470 and RCW 41.56.480 expressly apply to collective bargaining between SEIU 775NW and LRO, the subdivision of OFM that represents the governor. One of these statutes, RCW 41.56.480, provides that "[a] decision of the arbitration panel shall be final and binding on the parties, and may be enforced at the instance of either party." (Emphasis added.) See also RCW 41.56.450 (written determination of the issues in dispute "shall be final and binding upon both parties"). By law the governor is the employer and a party to the agreements and by law the governor is bound by the agreements.
¶ 60 Moreover, because RCW 74.39A.270 and .300 provide that until a request for funding is made and approved by the legislature, the agreements are not binding on the State, and additionally provide that the governor must request funding if the statutory prerequisites are met, read as a whole these statutes contemplate that a governor's request for funding necessarily has to be made at a time when the arbitrators' decisions are not binding on the legislature, authority, or the State.
¶ 61 In addition, the State's interpretation leads to an absurd result because, read as the State urges, RCW 74.39A.300 means that the duty to submit a request to fund arbitrated contracts to the legislature does not arise until the legislature has already approved and funded those very contracts. But once the legislature has determined to fund an *788 arbitrated contract, there would be no reason for the governor to include a request for such funding. Courts should avoid reading a statute in a way that results in unlikely, absurd, or strained consequences; it will not be presumed that the legislature intended absurd results. Tingey, 159 Wash.2d at 663-64, 152 P.3d 1020.
¶ 62 The State says, however, that the statutes retain meaning under its interpretation because if the legislature approves funding, the agreement is binding and the governor could not eliminate or reduce those amounts in the budget document for a supplemental budget. But RCW 74.39A.300(1) directs that the governor must request necessary funds "as a part of the proposed biennial or supplemental operating budget." (Emphasis added.) The statute expressly contemplates that the budget document for the biennium is to include such a request.
¶ 63 The State next points out that the mediation and arbitration provisions in RCW 41.56.430 through .470 and RCW 41.56.480 provide for binding arbitration for uniformed personnellaw enforcement personnel and firefightersin order to provide a binding method of resolving disputes while prohibiting these employees from striking. The State contends that as to this limited class of employees, an arbitrator's decision is final and binding, but not as to employees subject to mediation and arbitration under RCW 74.39A.270(2)(c).
¶ 64 Again, the statutes' language contradicts the State's interpretation. RCW 74.39A.270(2)(c) expressly states that RCW 41.56.480 applies. It then lists two exceptions to application of the mediation and arbitration provisions. One is the exception relied on by the State that says the arbitrators' decisions are not binding on the legislature (nor on the authority or the State) until approved by the legislature, which, as explained, does not apply here. The other exception relates to when collective bargaining must commence. Because RCW 74.39A.270(2)(c) expressly lists the exceptions that apply, it would be contrary to the legislature's intent if this court were to read another exception into the statute. See Allan v. Univ. of Wash., 140 Wash.2d 323, 345-46, 997 P.2d 360 (2000).
¶ 65 The State offers a number of other arguments in support of its position that the governor has no mandatory duty to include requests for funding the petitioners' contracts. The State emphasizes the fact that public collective bargaining does not mirror private sector collective bargaining because the public is an essential party in the former but not the latter. The State says that a statute cannot bind OFM or the governor, or their offices or agencies, to spend money or incur liability without an appropriation for that purpose, or to bind the legislature to make an appropriation. To do so, the State contends, would violate the prohibition in article VIII, section 4 of the Washington State Constitution that "[n]o moneys shall ever be paid out of the treasury of this state... except in pursuance of an appropriation by law." Likewise, the State says, RCW 43.88.130 provides that it is unlawful for a state agency to expend or contract to expend or incur liability in excess of appropriated amounts.
¶ 66 But the ultimate decision as to funding of the contracts remains at all times with the legislature. Under RCW 74.39A.270(2)(c)(ii), the legislature must approve the request to fund the collective bargaining agreements before any expenditure of state funds can occur. There is no danger of violation of article VIII, section 4 or of RCW 43.88.130 relating to expenditure of state funds.
¶ 67 The State also argues that arbitration panels do not perform the same role as the director of OFM in certifying financial feasibility. The State says that the requirement that arbitrators consider the State's financial ability to pay for compensation and benefit provisions of CBAs, RCW 41.56.465(5)(a)(ii), is not equivalent. The OFM director's determination occurs later than the arbitrators' decisions, which pertain to financial ability only as of the time of their decisions. The State reasons this case shows that financial conditions can change markedly by the time the director's determination of feasibility is made. The State also says that unlike the arbitrator's decision, the director's *789 and governor's determinations are constrained by the requirement of a balanced budget. Finally, the State urges that interest arbitration panels are not sufficiently knowledgeable or competent to evaluate all the multitude of programs and initiatives of the State and the policy decisions that must be made when planning the budget.
¶ 68 It is true that an arbitrator's decision occurs earlier in the process than a determination by the director of OFM as to financial feasibility, but the fact is that an economic downturn or upturn might occur at any time during the process. A delay of a few months of the current downturn would have meant that when the director made his determination the outlook might have led him to find financial feasibility, which could have changed by the time the budget was being considered by the legislature. More importantly, though, the statutory language is straightforward and permits satisfaction of the second prerequisite by either the director's determination of financial feasibility or a binding arbitration agreement. Neither determination will bind the State to pay that is in the hands of the legislature. As SEIU 775NW contends, it is within the legislature's purview to account for what would have been an unforeseeable event at the time an arbitrator makes a decision on the State's financial ability to pay.
¶ 69 The State also questions the wisdom of the statutory provisions pertaining to financial feasibility. The State contends that it makes no sense for negotiated agreements to be subject to the requirement that the director of OFM determine financial feasibility, while a request for funds must be made in the case of arbitrated agreements. The State contends it makes less sense that when the parties reach impasse on some issues the issues that go to interest arbitration are binding and must be submitted in the governor's budget, while negotiated terms are subject to the OFM director's determination of financial feasibility.
¶ 70 The statute plainly treats negotiated and arbitrated terms differently. But SEIU 775NW is correct that the legislature deliberately equated the roles of the OFM director and the arbitrator in assessing whether the State is in a position to fund the contract terms. The statute also plainly provides that if, as in the present case, some of the terms are negotiated and the director of OFM issues a determination they are not feasible financially, a request to fund them cannot be included in the governor's budget. A request to fund the provisions that resulted from interest arbitration, however, must be included and the legislature must approve or deny this request as a whole. RCW 74.39A.300(7).[10]
¶ 71 Finally, as to the meaning of RCW 74.39A.300(1), the State contends that even if "must" is mandatory, it refers only to the process by which, i.e., how, the governor is to request funding, if she requests it. I cannot agree that this is the intended meaning of the statute. First, the placement of commas setting off the clause beginning "as a part of the proposed" budget contradicts the State's reading. "A comma serves many functions, but its purpose always is to set a phrase apart from the rest of the sentence." E. Gig Harbor Improvement Ass'n v. Pierce County, 106 Wash.2d 707, 713, 724 P.2d 1009 (1986). Thus, the section states that as a substantive matter the governor must submit a request for funds, and that the request must be included in the proposed budget, if the requirements of subsection (2) are met. Further, subsections (1) and (2) together show when a request must be made and when it cannot be made. The relationship between the two indicates they are of the same nature, and subsection (2) plainly directs that as a substantive matter, the governor cannot submit a request if the requirements set out are not met. By the same token, the first section pertains to when the governor has to submit a request, not how one is submitted. Finally, if all that RCW 74.39A.300(1) entailed were directions for how to submit a request, the provision would be superfluous. The statute expressly refers to RCW 43.88.030, which itself sets out the *790 "process" for including requests in the governor's proposed budget. A court should avoid interpretation of statutes that renders their language superfluous. See In re Det. of Martin, 163 Wash.2d 501, 510, 182 P.3d 951 (2008) (quoting Whatcom County v. City of Bellingham, 128 Wash.2d 537, 546, 909 P.2d 1303 (1996)).
¶ 72 Lastly, reading the statute merely to overcome concerns about "transparency" is unnecessary. Under RCW 74.39A.300(5) the governor "shall periodically consult with the joint committee on employment relations established by RCW 41.80.010 regarding appropriations necessary to implement the compensation and fringe benefit provisions of any collective bargaining agreement and, upon completion of negotiations, advise the committee on the elements of the agreement and on any legislation necessary to implement such agreement." This communication serves to keep the legislature informed about the budget implications of the CBAs. It is also an example of the interplay between the branches of government with regard to the budget, discussed in part I above.
¶ 73 I would hold that by its plain language RCW 74.39A.300(1) sets forth a mandatory duty for the governor to request funds if the two requirements in subsection (2) are met. RCW 74.39A.300(2)(b) is satisfied if the request reflects the binding decision of an arbitration panel reached under RCW 74.39A.270. A "binding decision of an arbitration panel reached under RCW 74.39A.270(2)(c)" is a decision under the applicable collective bargaining provisions in chapter 41.56 RCW. RCW 74.39A.300(2)(b). In particular, it is the "final and binding decision" identified in RCW 41.56.480.
¶ 74 The State maintains, however, that even if the duty to request funds under RCW 74.39A.300(1) is mandatory and does not merely describe procedure, that duty does not involve the performance of a ministerial act subject to mandamus. As explained, the fact that a request for funds for one purpose may require adjustments elsewhere does not affect the determination that the duty specifically at issue, here, the governor's duty to request certain funding for a specific limited purpose, is nondiscretionary and ministerial. Accordingly, the governor has a mandatory ministerial duty to request funds to implement the arbitrated terms of SEIU 775NW's agreement.
¶ 75 A writ of mandamus will be issued only when there is no plain, speedy, and adequate remedy at law. RCW 7.16.170; Staples, 151 Wash.2d at 464, 89 P.3d 706.
A remedy is not inadequate merely because it is attended with delay, expense, annoyance, or even some hardship.
"There must be something in the nature of the action or proceeding that makes it apparent to this court that it will not be able to protect the rights of the litigants or afford them adequate redress, otherwise than through the exercise of this extraordinary jurisdiction."
State ex rel. O'Brien v. Police Court of Seattle, 14 Wash.2d 340, 347-48, 128 P.2d 332 (1942) (citations omitted) (quoting State ex rel. Miller v. Superior Court, 40 Wash. 555, 559, 82 P. 877 (1905)).
¶ 76 SEIU 775NW says that the State does not dispute that the union lacks any plain, speedy, or adequate remedy at law.[11] The State does not include this remedy issue as one of its arguments in the briefing, although it does suggest in the course of other arguments that its interpretation of RCW 74.39A.300(1) does not prevent the petitioners from seeking, and the legislature from appropriating, the funds needed to implement their agreements. What SEIU 775NW sought, however, was the governor's inclusion of funding requests in her official budget document. A request directly from the union would not involve the same formality or carry the same weight. Adequate redress was not available other than by way of the extraordinary writ.

Conclusion
¶ 77 The word "must" in RCW 74.39A.300(1) is mandatory and requires the governor to include requests in the budget document submitted to the legislature for *791 funds to implement compensation and fringe benefit provisions in CBAs entered into pursuant to RCW 74.39A.270 when the prerequisites of RCW 74.39A.300(2)(a) and .300(2)(b) are satisfied. Subsection (b) is satisfied if the request reflects the binding decision of an arbitration panel reached under RCW 74.39A.270 (which directs that the mediation and interest arbitration provisions in RCW 41.56.430 through .470 and RCW 41.56.480 apply; RCW 41.56.480 contains the description of "binding decision" for purposes of RCW 74.39A.300(2)(b)).
¶ 78 This court should have granted the petition for a writ of mandamus requiring the governor to submit a revised budget document to the legislature that included a request for funds to implement the compensation and fringe benefit provisions of the CBA entered into under RCW 74.39A.270. Absent its having done so in time for its decision to be effective for the present dispute, it should nonetheless have reached this conclusion to provide guidance in future disputes where there is a question concerning a mandatory duty to include an item as part of the proposed budget that the governor submits to the legislature. At a minimum, this court should not grant the governor unlimited discretion to submit a proposed budget without regard to mandatory duties and should not inject itself into policy questions that are the province of the executive and legislative branches of government.
¶ 79 I dissent.
WE CONCUR: SUSAN OWENS, MARY E. FAIRHURST and RICHARD B. SANDERS, JJ.
SANDERS, J. (concurring in dissent).
¶ 80 This case deserved swift action to protect the rights of these workers and their union. I have signed the dissent but would have preferred to initially decide this case by order with opinion to follow.
¶ 81 I concur in the dissent.
NOTES
[1] These documents are on file and available for public viewing at the Washington State Supreme Court. For the sake of thoroughness, this opinion provides parallel citations to both the agreed statement of facts and its appendices in the form "ASF775 (JSF775)" whenever exhibits from the appendices are cited.
[2] RCW 74.39.A.270(1) reads, in relevant part: "Solely for the purposes of collective bargaining..., the governor is the public employer, as defined in chapter 41.56 RCW, of individual providers, who, solely for the purposes of collective bargaining, are public employees as defined in chapter 41.56 RCW."
[3] "[W]hat we're seeing is not only disconcerting from a forecaster's point of view, but because we're [seeing] below 0 percent year-over-year growth, we're concerned about the drop in collections relative to a fresh forecast that, itself, had already gone down by $167 million." ASF775 Ex. 4, at 607-08 (JSF775, at 0037-38). To be exact, "our revenue is not performing nearly as well as our economy." Id. at 610 (JSF775, at 0040). Opitz summarized the outlook: "[L]ooking forward in time, we're seeing much worse news," id. at 613 (JSF775, at 0043), with "a bottom line in which ... we're $2.7 billion short.... If we were to spend the entire rainy day fund, we would knock that down to $1.956 billion short," id. at 615 (JSF775, at 0045). This budget scenario "doesn't capture any collectively bargained wage increases [or] arbitration awards." Id. at 615 (JSF775, at 0045). See generally id. Ex. 4 (JSF775, at 0027-108) (complete testimony).
[4] The director's review of the financial feasibility of the collective bargaining agreement and the arbitration award was based on ever-deteriorating revenue forecasts. See, e.g., ASF775 Ex. 12, at 4 (downward revision of 2009-2011 revenue forecasts by over $1.4 billion in November 2008) (JSF775, at 0406), Ex. 13, at 2 (reporting an additional $400 million downward revision in December 2008) (JSF775, at 0514). These forecasts were even gloomier than those that led the deputy director of OFM to report during the arbitration hearing that the state faced a staggering budget shortfall of $2.7 billion for the 2009-2011 biennium. Id. Ex. 4, at 615 (JSF775, at 0045).
[5] The relevant text of RCW 74.39A.300 reads:

(1) Upon meeting the requirements of subsection (2) of this section, the governor must submit, as a part of the proposed biennial or supplemental operating budget .. ., a request for funds necessary ... to implement the compensation and fringe benefits provisions of a collective bargaining agreement entered into under RCW 74.39A.270....
(2) A request for funds necessary to implement the compensation and fringe benefits provisions of a collective bargaining agreement entered into under RCW 74.39A.270 shall not be submitted by the governor to the legislature unless such request:
(a) Has been submitted to the director of financial management by October 1st prior to the legislative session at which the request is to be considered; and
(b) Has been certified by the director of financial management as being feasible financially for the state or reflects the binding decision of an arbitration panel reached under RCW 74.39A.270(2)(c).
[6] The petitioner incorrectly equates a mandatory duty with a ministerial one and urges us to issue the writ because the language of RCW 74.39A.300(1) states that the governor "must" include the funding request in her budget proposal. See supra note 5; Br. of Pet'r at 12, 16-17 (arguing that mandamus is appropriate because the governor had no choice but to request the necessary funding after the dual statutory prerequisites of RCW 74.39A.300(2) were satisfied).
[7] The governor could avoid this zero-sum-game dilemma by proposing new taxes. Such taxes could be calibrated and permanently dedicated to finance the contract at issue in this case and others like it, thereby eliminating the risk that such contracts would crowd out other budgetary priorities. But this solution would require the governor to exercise her judgment regarding competing fiscal and policy objectives, a requirement similarly at odds with the principles of mandamus.
[8] Because we hold that the duty identified by the petitioner is not ministerial, we need not reach a decision as to whether it is mandatory. To clarify, even if the duty is mandatory as the petitioner contends, its nonministerial nature precludes the application of mandamus, and any inquiry into the degree to which RCW 74.39A.300 obligates the governor to include funding for compensation and fringe benefits in her proposed biennial budget document would be purely academic. See Brown, supra pp. 777-78 and accompanying text.
[9] Cf. City of Seattle, 137 Wash. at 460-61, 242 P. 966 (denying mandamus and noting that the city had no funds available for the expenditure sought to be compelled).
[10] See generally Wash. State Caseload Forecast Council, Caseload Forecasts (2007), available at www.cfc.wa.gov (last visited Apr. 1.2010) (fore-casting substantial increases in health and human services, public education, and corrections caseloads); see also Curt Woodward, Another $250 Million Caseload Hit to Wash. Budget, Seattle Times, July 1, 2009, available at http:// seattletimes.nwsource.com/html/localnews/2009 408239_apwacaseloadforecast1stldwritethru. html (last visited Apr. 1, 2010) (citing July 2009 state caseload forecasts and noting that "the recession-hammered economy" has driven more people to seek public assistance).
[11] Candidly, the petitioner conceded that effective relief could not be granted after the legislature adjourned. Br. of Pet'r at 22 ("[a]bsent an immediate writ, Petitioner will be denied its rights under the statute....").
[12] Even if SEIU had asked for such a writ, it would be improper to grant it. We will not issue a writ in anticipation of a supposed omission of a duty. See Walker, 124 Wash.2d at 409, 879 P.2d 920.
[13] The budget situation has worsened since oral arguments were heard in this case and since the legislature adjourned. See Econ. & Revenue Forecast Council, Washington State Economic and Revenue Forecast 56 (Sept. 2009), available at www. erfc.wa.gov/publications/documents/sep09pub. pdf (last visited Apr. 1, 2010) (projecting a $185 million shortfall at the end of the 2009-11 biennium); Woodward, supra note 10 (noting that the latest caseload forecast estimates increased demand for state services will cost $250 million). On these grim facts, it seems highly unlikely that the legislature will be able to allocate sufficient funding to finance outdated and financially unfeasible compensation and fringe benefit increases for SEIU's members, regardless of whether a request for such funding appears in the governor's proposed budget.
[1] The majority says this case may be moot but proceeds to the merits anyway. Since I disagree with the majority on the merits, I, too, answer the issues.
[2] References to facts in the agreed statement of facts in this case will be to ASF775.
[3] The appendices to the agreed statement of facts include pagination for the individual exhibits, as well as pagination that continues through the entire set of appendices. The latter are cited as, for example, JSF775 0045.
[4] This conclusion represents the director's understanding of the law and it is, as explained below, incorrect with regard to arbitrated provisions under the statutes that apply here.
[5] Under RCW 43.88.060, the governor must submit the budget document no later than December 20 of the year preceding the year of the legislative session during which it will be considered.
[6] The 2009 legislative session began January 12, 2009, and the last day of the regular session was April 26, 2009. ASF775 ¶ 18.
[7] The State cites Dicomes, 113 Wash.2d at 622, 782 P.2d 1002, for the proposition that it is within the discretion of the governor to determine the scope and extent of budget requests. This case did not concern a question about the power of the governor to formulate a budget for submission to the legislature. It involved a tort claim for wrongful discharge in violation of public policy where the plaintiff argued that she had been discharged for releasing information indicating that the Department of Licensing budget did not include expenditure of surplus funds that had accumulated in the medical disciplinary account. The court explained that the governor submits a budget to the legislature that consists of budget proposals compiled by individual agencies and that "it is generally within the discretion of the agency head and the Governor to determine the scope and extent of budgetary requests." Id. The court did not say that the governor has unlimited discretion in formulating the budget document for submission to the legislature.
[8] The parties agree that the arbitrator is the "arbitration panel."
[9] The "authority" referred to is the "home care quality authority." RCW 74.39A.240(1).
[10] This statute adds that if the legislature rejects or does not act on the submission, then the agreement must be reopened "solely for the purposes of renegotiating the funds necessary to implement the agreement." RCW 74.39A.300(3).
[11] SEIU 775NW also says, correctly, that the State does not dispute that it is beneficially interested and thus has standing to bring an action for mandamus. See RCW 7.16.170.